STATE of Tennessee

v.

Paul Dennis REID, Jr.

Supreme Court of Tennessee,
at Nashville.

Feb. 3, 2005 Session.

May 24, 2005.

James A. Simmons and Thomas F. Bloom, Nashville, Tennessee, for the Appellant, Paul Dennis Reid, Jr.

Paul G. Summers, Attorney General and Reporter; Michael E. Moore, Solicitor General; Jennifer L. Smith, Associate Deputy Attorney General; John W. Carney, Jr., District Attorney General; and Arthur F. Bieber, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

E. RILEY ANDERSON, J., delivered the opinion of the court, in which FRANK F. DROWOTA, III, C.J., and JANICE M. HOLDER and WILLIAM M. BARKER, JJ., joined. ADOLPHO A. BIRCH, JR., J., filed a separate concurring/dissenting opinion.

The defendant, Paul Dennis Reid, Jr., was convicted of two counts of premeditated first degree murder, two counts of especially aggravated kidnapping, and one count of especially aggravated robbery. In imposing a death sentence for each count of first degree murder, the jury found three aggravating circumstances, i.e., that the defendant was previously convicted of one or more felonies whose statutory elements involved the use of violence to the person, that the murders were especially heinous, atrocious or cruel in that they involved torture or serious physical

abuse beyond that necessary to produce death, and that the murders were committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another, had been proven beyond a reasonable doubt. Tenn.Code Ann. § 39–13–204(i)(2), (5), (6) (2003). In addition, the jury found that the evidence of aggravating circumstances outweighed evidence of mitigating circumstances beyond a reasonable doubt. Tenn. Code Ann. § 39–13–204(c) (2003). The Court of Criminal Appeals affirmed the convictions and the death sentences.

After the case was docketed in this Court, we entered an order identifying numerous issues for oral argument. We now hold as follows: 1) the trial court did not err in finding that the defendant was competent to stand trial; 2) the trial court did not err in excluding evidence during the competency hearing; 3) the trial court did not err in refusing to hold a new competency hearing on the basis that a court-appointed expert was biased; 4) the evidence was sufficient to support the defendant's convictions; 5) the trial court did not err in denying the defendant's motion to dismiss on the basis that the aggravating circumstances were not stated in the indictment; 6) the trial court did not err in allowing the prosecution to amend the indictment; 7) the trial court did not commit reversible error in limiting extrinsic evidence of inconsistent statements; 8) the evidence was sufficient to support the aggravating circumstances found by the jury; 9) the death sentences were not arbitrary or disproportionate as imposed in this case; 10) the evidence was sufficient to support the jury's finding that evidence of aggravating circumstances outweighed evidence of mitigating circumstances; 11) the capital sentencing statutes are not unconstitutional on the basis that they allow evidence to be admitted in violation of due

process and confrontation under the United States Constitution; 12) the trial court did not err in admitting photographs of the victims at the crime scene during sentencing; 13) the trial court did not commit reversible error in failing to charge the jury on the "catch-all" statutory provision as to mitigating circumstances; and 14) the trial court did not err in denying a new trial based on prosecutorial misconduct during sentencing. We also agree with the Court of Criminal Appeals' conclusions with respect to the remaining issues, the relevant portions of which are included in the appendix to this opinion. Accordingly, the Court of Criminal Appeals' judgment is affirmed.

The defendant, Paul Dennis Reid, Jr., was indicted for two counts of premeditated murder, two counts of felony murder during the perpetration of a robbery, two counts of especially aggravated kidnapping, and one count of aggravated robbery. The evidence presented during trial is summarized as follows.

### Guilt Phase

On the night of April 23, 1997, Angela Holmes, age twenty-one, and Michelle Mace, age sixteen, were working at a Baskin–Robbins store on Wilma Rudolph Boulevard in Clarksville, Tennessee. The store regularly closed at 10:00 p.m. At around 10:10 p.m., Craig Mace arrived at the store to pick up his sister, Michelle. He noticed that Angela Holmes' car was in the parking lot and that the lights inside the store were on. He entered the store through an unlocked door and found no one inside. Mace called 911.

Officers were dispatched to the scene and searched the store. They found the cash register drawer empty, except for some coins, and a safe in an office with the top removed.[1] The victims' purses were

---

1. The owner of the store testified that $1,565.58 had been stolen.

found at the store; no money had been taken from the purses. A mop and bucket were found in the customer area, and the freezer was left open.

On the morning of April 24, 1997, the bodies of Angela Holmes and Michelle Mace were found at the Dunbar Cave State Natural Area in Montgomery County, Tennessee, which was between 2.1 and 3.6 miles from the Baskin–Robbins store.[2] Both victims had suffered deep stab wounds to their necks, as well as stab wounds, cuts, and abrasions to other parts of their bodies. Both had bled to death.

Lavanda Zimmerman testified that she had visited with the victims at the Baskin–Robbins store from 9:20 p.m. until 10:00 p.m. on April 23, 1997. At one point, a man in his late twenties or early thirties entered the store and became "obnoxious" and "very loud" about the prices before leaving. As Zimmerman left the store at 10:00 p.m., she saw a "shiny red" car enter the parking lot. Although she testified that a photograph of the defendant's car— a 1997 red, four-door Ford Escort—was "consistent" with the car she had seen, she conceded that she told a private investigator prior to trial that the car was "dark reddish or maroon." She also conceded that she did not tell officers about the car when she was interviewed in May of 1997.

George Hertenstein testified that he was driving to work at 9:59 p.m. on April 23, 1997, when he saw a car driving slowly on Rossview Road near the BaskinRobbins store. When Hertenstein attempted to pass the car, the car abruptly turned onto Union Hall Road, which was one road after the entrance to the Baskin–Robbins store. Hertenstein testified that the car was "identical" to photographs of the defendant's car. On cross-examination, Herten-

stein admitted that he contacted police in June of 1997 after he saw pictures of the defendant's car on the television news. He also acknowledged that he told a private investigator that the car he saw had two doors, whereas the defendant's car had four doors.

Jerry Perdue, a friend of Michelle Mace, testified that he saw a small red car in the Baskin–Robbins parking lot shortly after 10:00 p.m. on April 23, 1997. He further testified that photographs of the defendant's car "could very well be" the car he saw in the parking lot. He acknowledged that he told law enforcement officers that the car he saw was a two-door hatchback but that he was no longer sure. He also stated that he told officers that the car had black bumpers.

Elfrieda Lane testified that she was a friend of the defendant and that she lived three miles from the Baskin–Robbins store in Clarksville, Tennessee. Lane testified that the defendant called her "once or twice" a week from February to April of 1997 and that they discussed the defendant's effort to be re-hired at a Shoney's restaurant. Lane testified that the defendant was at her home on or about April 18, 1997, and that he had been driving a red car. According to Lane, the defendant telephoned her on April 24; he told her that he had planned to visit her the previous evening but that it had gotten too late.

Business records revealed that the defendant purchased gasoline at a Texaco station in Clarksville at 9:45 p.m. on April 23, 1997. The Texaco station was 0.7 miles from Lane's home and 0.9 miles from the Baskin–Robbins store. A signed credit card receipt showed that the defendant purchased $11.95 worth of gasoline.

---

2. Detective Robert Miller testified that three different routes could be taken to travel from Baskin–Robbins to Dunbar Cave park. The driving time for the three routes ranged from four to five minutes.

Handwriting experts confirmed that the signature on the receipt was the defendant's. A copy of the receipt was also found in the defendant's wallet.

Jay Smith and Shannon Reeves testified that they saw a car near Dunbar Cave around 10:30 p.m. on the night of April 23, 1997. They were at the home of Smith's girlfriend, Holly Schmidt, who lived across the street from the Dunbar Cave entrance and parking lot. Smith testified that the car was a red four-door and that he thought it was "odd" because the car was not in a parking space. Smith, a friend of Michelle Mace, conceded that he had told officers the car looked like several makes of cars, none of which matched the defendant's car. Smith nonetheless testified that the car he saw was "consistent" with photographs of the defendant's car. Reeves testified that he saw a car in the Dunbar Cave parking lot. Although he could not make out any details about the car, he noticed that the car's headlights were on and, at one point, changed from low to high beam.

Samero Zavaro, a serologist and DNA specialist with the Tennessee Bureau of Investigation, testified that a DNA sample taken from blood found on the defendant's left tennis shoe was consistent with the DNA profile of Angela Holmes. In addition, a DNA sample taken from small blood stains found on the right tennis shoe was consistent with a mixture of two or more donors from which neither Angela Holmes nor Michelle Mace could be excluded. Zavaro testified that the probability of selecting an unrelated individual that would have the same DNA profile as the sample on the defendant's left shoe was one in 6,800 Caucasian individuals and one in 4,400 African–American individuals.

Meghan Clement, as associate director of forensic identity testing at Laboratory Corporation of America ("LabCorp"), testified about additional DNA testing. She testified that the DNA sample found in the blood on the defendant's left shoe was consistent with the DNA profile of Angela Holmes. The DNA sample found in the blood on the defendant's right shoe did not exclude the defendant, Angela Holmes or Michelle Mace. Clement testified that a combined statistical analysis revealed that the probability that the blood found on the defendant's left shoe was from a person other than Angela Holmes was one in 1,810,000 in the Caucasian population, one in 3,250,000 in the African–American population, one in 4,950,000 in the Southeastern Hispanic population, and one in 4,520,000 in the Southwestern Hispanic population.

Linda Littlejohn, a fiber comparison specialist with the Tennessee Bureau of Investigation, testified that fibers found on the victims' clothing were compared to fibers in the defendant's car. According to Littlejohn, three fibers found on Angela Holmes' clothing were consistent with samples taken from the defendant's backseat and floor mats. Similarly, eight fibers found on Michelle Mace's clothing and shoes were consistent with fibers from the defendant's backseat, carpet, and the edge of the backseat. Littlejohn testified that it was "a very rare case that you find eleven fibers that match one source." Moreover, the evidence showed that the floor mats found in the defendant's car were not standard for the Ford Escort, but rather, had been purchased by the defendant at Wal-Mart on March 25, 1997.

Littlejohn testified that she also analyzed photographs of footprints found at Baskin–Robbins and Dunbar Cave, as well as nine pairs of shoes belonging to the defendant. Littlejohn conceded that the shoe prints did not match the defendant's shoes.

Two witnesses testified that the defendant had told them that he could make

money by committing robberies. Danny Tackett testified that he was working with the defendant at Shoney's in January of 1997 when the defendant suggested robbing a "fast food place [in the] middle of the night" because there were "no witnesses." Tackett thought the defendant was joking. Likewise, Jeffery Potter testified that in January of 1997, the defendant expressed dissatisfaction with his job and suggested robbery as a way to make money.

The evidence showed that the defendant was unemployed and had very little money in his checking account in the spring of 1997. However, Linda Patton, a friend of the defendant, testified that shortly after April 23, 1997, the defendant paid half of her air fare to travel to Nashville from Texas. Patton further testified that the defendant paid cash for her meals, lodging, and entertainment in Nashville.

Additional circumstantial evidence was introduced by the prosecution. Loretto Diorio and her twelve-year-old son, Stephen, testified that they believed they saw the defendant at the Dunbar Cave park on February 17, 1997; however, they were not 100% certain. Barbara Jayroe testified that she saw the defendant at the Dunbar Cave park on April 8, 1997. She acknowledged that she told the police she was not sure the defendant was the same man she saw in the park. Mitchell Roberts testified that the defendant asked him about getting re-hired at Shoney's in late May or June of 1997. According to Roberts, the defendant was driving a small red car and was in possession of a knife with a blade about "eight or nine inches long."

Dr. Charles Harlan testified that he performed the autopsies on the two victims, Angela Holmes and Michelle Mace. Dr. Harlan testified that Holmes died as a result of a stab wound to her neck that went "all the way to her backbone." The wound, which was consistent with a knife blade of eight or nine inches, transected the carotid artery and jugular vein. Dr. Harlan testified that Mace had suffered fourteen stab wounds, including a fatal stab wound in her neck. Dr. Harlan stated that a compound incision penetrated Mace's backbone, consisted of three changes in direction, and was consistent with a sawing motion. According to Dr. Harlan, both victims would have taken five to fifteen minutes to bleed to death and would have been conscious eighty percent of that time.

Several witnesses testified for the defense in the guilt phase of the proceeding. Catherine Naylor testified that she saw a dark red or maroon car in the parking lot of Baskin–Robbins at 9:48 p.m. on April 23, 1997. According to Naylor, the car she saw did not match photographs of the defendant's car and was not a Ford Escort. Tammy Thompson and Dustin Keller, students at Austin Peay University, testified that they were at Baskin–Robbins at 9:50 p.m. on April 23, 1997, and that they were driving a 1993 red Nissan Sentra. They saw a man in Baskin–Robbins with shoulder-length hair who Thompson described as "scraggly." Both Thompson and Keller testified that defendant was not the man they saw in the store that night.

Barbara McWilliams and Martin McIntyre, employees at Riverbend Maximum Security prison in Nashville, testified that they were in the parking lot of the Dunbar Cave park between 10:50 and 11:30 p.m. on April 23, 1997. Both McWilliams and McIntyre testified that they did not see any other cars in the parking lot during that time.

Dr. William N. Shields, a professor of biology, testified for the defense as an expert in DNA analysis and zoology and disagreed with the results of the combined statistical analysis performed by LabCorp.

In Shields' view, the probability that a person other than Angela Holmes was the source of the blood on the defendant's left shoe was between one in 122,000 and one in 12,000,000 in the Caucasian population. His "best estimate" was one in 1,200,000. Shields also testified that there was no reason for LabCorp to have mixed the blood stains found on the defendant's right shoe before conducting its analysis.

After considering the evidence, the jury convicted the defendant of two counts of premeditated first degree murder, two counts of felony murder, two counts of especially aggravated kidnapping, and one count of especially aggravated robbery. The trial court merged the two counts of felony murder with the two counts of premeditated first degree murder. A sentencing hearing was then held for the jury to determine the punishment.

### Penalty Phase

The prosecution introduced testimony from several of Angela Holmes' family members. Her husband, Tobaris Holmes, testified that his wife's murder "changed everyone's life," including their infant daughter who "would never know her mother." He believed he should have been able to protect his wife. Kim Campbell, Angela's mother, testified that she had a close relationship with her daughter and that she could no longer take family photographs because there is a "void." She further testified that the murder had "traumatized" her youngest son.

The prosecution also introduced testimony from several of Michelle Mace's family members. Craig Mace, the victim's brother, testified about the effect of his sister's murder on their family. He testified that he had become "angry, sad, and fearful," and that his father was "totally destroyed"

by the killing. Connie Black, the victim's mother, likewise testified as to the impact of the killing on the family and its effect on the victim's older sister. She testified that she no longer had her "little girl anymore" and that the killing caused a "void inside her."

Dr. Charles Harlan again described the wounds suffered by Angela Holmes and Michelle Mace. Both victims had massive incisions to their throats, as well as other cuts, bruises, and abrasions. The wounds to the victims' throats had cut vital arteries and veins. The wounds were deep enough to also injure the victims' spines. Dr. Harlan repeated his guilt-phase testimony that the victims would have bled to death in five to fifteen minutes and that the victims would have been conscious and would have felt pain for eighty percent of that time. Photographs depicting the victims' injuries were identified by Dr. Harlan and shown to the jury.

Finally, the prosecution introduced evidence that the defendant had two prior convictions for first degree murder[3] and a prior conviction for especially aggravated robbery in Davidson County, Tennessee. In addition, the defendant had one prior conviction for aggravated robbery in Texas.

In mitigation, the defendant presented extensive testimony from mental health and medical experts. Dr. Xavier Amador, a clinical psychologist, testified that the defendant suffered from multiple conditions: chronic schizophrenia of the paranoid type, a cognitive disorder not otherwise specified, documented brain damage, and mental illness associated with brain dysfunction. According to Dr. Amador, the defendant also had personality change of a combined type caused by head trauma

---

3. The defendant's convictions and death sentences for these offenses have been affirmed

on direct appeal. *State v. Reid,* 91 S.W.3d 247 (Tenn.2002).

and characterized by aggressive and impulsive behavior.

Dr. Amador described the defendant's family history, behavioral problems, and history of mental illness. The defendant had a documented history of head trauma, which included several head injuries suffered in his childhood. The defendant had been diagnosed as having brain dysfunction in 1964 and 1966 and psychotic disorders in 1978 and 1984. Dr. Amador stated that the defendant believed that he has been under government surveillance since 1978:

> There are several delusions that are organized around one central delusion. He has the long-standing belief that for over twenty years, he's been under constant surveillance by a secret government agency. They videotaped him, they taped—audiotape, they bugged his car, his house. He had been chosen for this surveillance he believes because of some special qualities that he possesses. The relationship Mr. Reid has to the government agency that he believes is doing this to him is very mixed. At times, he feels tortured and ... paranoid about this agency. At other time[s], he talks about his great loyalty to this agency.... And this is simply the center or the core of his delusional beliefs.

Dr. Amador did not believe the defendant was malingering; to the contrary, he stated that the defendant suffered from anosognosia, a symptom of psychosis in which a person with a brain injury compulsively attempts to prove he or she does not have a mental illness. Although the defendant "wants people to believe he is normal," Dr. Amador stated that the delusions emerged after hours of interviews:

> He would make references to things that he couldn't talk about, things he was not at liberty to say and I had to spend several hours listening to him talk about things that had nothing to do with the surveillance. But eventually, and this is over the course of the initial twenty hours of interview, I was able to document and detail and corroborate ... what other people said he used to talk about. That he was under government surveillance twenty-four hours a day.

Patricia Allen, a speech and language therapist at Vanderbilt Medical Center in Nashville, testified that she evaluated the defendant for fifteen hours in 1998. She testified that the defendant was born with a deformed ear and hearing loss. She stated that the defendant's speech and language skills were consistent with one who has had "significant acquired brain injury." She testified that the defendant had suffered at least four documented head injuries and that the injuries occurred during important developmental periods. The defendant was unable to "problem solve in integrated ways." According to Allen, the defendant scored "very poor to below average" on tests designed to measure language and reasoning skills.

Dr. Pamela Auble, a clinical neuropsychologist, testified that she interviewed the defendant, conducted testing, and reviewed the defendant's medical and social histories. She testified that the defendant had been struck in the head by his father in 1962 and that the defendant suffered additional head injuries from accidents that occurred in 1971, 1972, and 1990. Dr. Auble testified that the defendant's left temporal lobe, the area of the brain controlling language and behavior, was "shrunken and distorted." According to Dr. Auble, the brain damage caused the defendant's psychotic disorder with delusions and resulted in impairments in the defendant's behavior. Dr. Auble explained that the defendant had difficulty thinking and that he exhibited aggression, psycho-

sis, and delusions. The defendant met the criteria for antisocial personality disorder, and he believed in a government plot to control and to kill him.

Dr. Auble testified that the defendant was not malingering. She explained that the defendant had a family history of mental illness and that documented evidence of the defendant's delusions had "been around for a long time." She testified that her testing measured whether a person is faking emotional or mental problems and that the measuring scales were not elevated when applied to the defendant.

Dr. Robert Kessler, a neurologist, testified that he examined MRI and PET scans of the defendant's brain. He described several abnormalities in the defendant's brain, including evidence of traumatic injury. Dr. Kessler explained that the folds of the left temporal lobe were shrunken and indicative of decreased function. He stated that these kinds of brain lesions cause a condition that mimics schizophrenia and bear a strong statistical association to psychotic disorders.

In rebuttal, the State offered the testimony of Dr. William Bernet, a forensic psychiatrist, who testified that he believed the defendant was malingering. Although the defendant had an antisocial personality disorder, Dr. Bernet believed the defendant had fabricated his delusions in the past. He explained:

> I think that [the defendant] has a pattern of malingering ... symptoms. And by malingering what I mean is that—he at times makes things up. At times he fabricates symptoms. Malingering generally means that you pretend that you have something wrong with yourself when you really don't.

Dr. Bernet conceded that the defendant had evidence of brain damage and a history of mental problems, including delusions. Dr. Bernet further testified, however, that he "couldn't identify any relationship between [the defendant's] brain injury and the events that led to his arrest and the killing of these two women."

After deliberating, the jury imposed a death sentence for both counts of first degree murder. The jury found that three aggravating circumstances—the defendant was previously convicted of one or more felonies whose statutory elements involved the use of violence to the person, the murders were especially heinous, atrocious or cruel in that they involved torture or serious physical abuse beyond that necessary to produce death, and the murders were committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another—had been proven beyond a reasonable doubt. Tenn.Code Ann. § 39–13–204(i)(2), (5), (6) (2003). In addition, the jury found that the evidence of aggravating circumstances outweighed evidence of mitigating circumstances beyond a reasonable doubt. Tenn.Code Ann. § 39–13–204(c) (2003).

On appeal, the Court of Criminal Appeals affirmed the defendant's convictions and death sentences. The defendant's appeal was then automatically docketed in this Court.

## ANALYSIS

### Competency Issues

The defendant argues that the trial court erred in finding that he was competent to stand trial. In making this argument, the defendant specifically contends that the trial court erred by placing the burden of proof upon the defense, by excluding evidence, and by relying upon a court-appointed expert. The State asserts that the trial court correctly found that the defendant was competent to stand trial

after conducting a full and fair competency proceeding.

In September of 1999, eight days before the trial was to begin, the defendant filed a motion for a determination of his competency. The trial court granted the motion and held a competency hearing over the course of three days. We begin our review of this issue by summarizing the evidence in the competency hearing.

Dr. Pamela Auble, a psychologist, testified that she examined the defendant on six occasions beginning in January of 1998. As part of her evaluation, Dr. Auble also interviewed the defendant's family members and reviewed his medical records, educational records, social histories, and other information. According to Dr. Auble, in January of 1999, the defendant told her that he had been under surveillance by the government for over thirteen years. The defendant also told Dr. Auble that the government had radiated his body with a magnetic field, which allowed his actions to be monitored on a remote screen by the Central Intelligence Agency. According to Dr. Auble, the defendant believed that the surveillance method had been developed by the Soviet Union.

Dr. Auble testified that concerns about the defendant's competency to stand trial emerged during the defendant's prior trial for two first degree murder charges in Davidson County, Tennessee.[4] According to information Dr. Auble received from defense counsel, a jury consultant, and a defense investigator, the defendant seemed primarily concerned with his snacks and meals during the prior trial, and he did not appear to realize that he might receive a death sentence. The defendant believed that the judge, jury, and attorneys were playing roles during the

trial that had been scripted. He refused to discuss that case with his attorney, and he believed jurors had been trying to make comments to him. According to Dr. Auble, the defendant also believed that fingerprint and blood evidence had been planted against him.

As a result of her earlier examination, Dr. Auble testified that the defendant was not competent to stand trial. She stated that the defendant believed that he was being monitored by the government and that his attorneys were part of a script to kill him. She stated that the defendant's brain damage from multiple injuries left the defendant unable to assist in his own defense because he could not focus on key issues; indeed, Dr. Auble noted that the defendant was preoccupied with irrelevant topics and the subjects of his delusions:

> He believes that the people in the courtroom know that he's innocent, including the District Attorney and the Judge and the policemen who interviewed him, but that nevertheless these charges have been set up. And there's a script that people play. That is being acted out. And therefore, . . . [the defendant] can not appraise the outcome of the proceedings. . . . His delusions also interfere in his ability to assist in his own defense. [The defendant's] reality is distorted. His belief that everything is predetermined at this point. That it doesn't matter if he helps his defense or not.

Dr. Auble also observed that the defendant's strong desire to appear normal resulted in his insistence that mitigating evidence not be presented in his own behalf.

On cross-examination, Dr. Auble conceded that the defendant had been diagnosed as malingering in earlier cases in

---

4. Dr. Auble testified on behalf of the defendant in the penalty phase of the earlier trial as

well. *See Reid,* 91 S.W.3d at 268–69.

Texas and that the defendant even admitted that he had "fooled the shrinks" in the late 1970s or early 1980s. She also conceded that the defendant had discussed aspects of his prior first degree murder trial with attorneys and that he had ultimately agreed to present mitigating evidence in that case.

Dr. Xavier Amador, a psychologist, testified that he examined the defendant for over twenty hours in November of 1998. Although the defendant suffered from delusions and anosognosia, Dr. Amador initially concluded that the defendant was able to assist in his defense and was, therefore, competent for his capital murder trial held in April of 1999 in Nashville. However, as the defendant began to include his attorneys in his delusions, Dr. Amador later determined that the delusions impaired the defendant's ability to disclose relevant information and "thwart[ed]" his desire to present evidence in his own behalf. The defendant referred to one of his attorneys as "Satan," and he believed the attorneys, the prosecutors, and the trial judge were being controlled by a surveillance team with "subliminal magnetic technology." Dr. Amador stated that the defendant had an understanding of the legal process but could not apply that understanding to his own proceedings. As a result, the defendant was not competent to stand trial.

On cross-examination, Dr. Amador acknowledged that the defendant admitted he had faked delusions in the past and that other mental health professionals had determined the defendant to be malingering. Dr. Amador also conceded that the defendant agreed with defense counsel's presentation of mitigating evidence in the prior capital murder trial. Dr. Amador nonetheless testified that the defendant's IQ was in the "low average" range and that

the defendant was not capable of faking mental illness.

Dr. William Bernet, a forensic psychiatrist at Vanderbilt University, testified that the defendant was competent to stand trial. Dr. Bernet met with the defendant three times, including the day before the competency hearing. He determined that the defendant suffered from antisocial personality disorder, delusional paranoia, and "a tendency to malinger." Dr. Bernet further determined, however, that the defendant was able to discuss various aspects of his case, including his refusal to accept a plea bargain because he was innocent, the prosecution's DNA evidence, and the use of mitigating proof such as his brain injuries, dyslexia, troubled childhood, and low intelligence level. He explained:

> I talked to [the defendant] about the different charges and the process; for instance, we talked about what happened in Court, who the different people are in the Court, the roles of the Defense Attorney, the Prosecuting Attorney, the witnesses, the Judge, and he seemed to have a very good understanding of how Court works. He seems to have an understanding of some of the details and not just kind of the big picture. . . .

According to Dr. Bernet, the defendant did not want to present evidence of mental illness because he did not believe he had a mental disorder. Dr. Bernet testified that the defendant was able to communicate with his attorneys, that he understood that he may be acquitted or convicted, and that he knew the possible punishments, including death by lethal injection, if he were found guilty. In sum, Dr. Bernet stated that the defendant was competent to stand trial.

Dr. Cynthia Turner–Graham, a board-certified psychiatrist who was appointed to serve as an independent expert by the trial

court, testified that the defendant was competent to stand trial. She testified that the defendant understood the nature of the charges against him and believed he could present a successful alibi defense. The defendant believed he had a good working relationship with his attorneys, though they often disagreed about defense strategy. According to Dr. Turner–Graham, the defendant discussed the importance of mitigation evidence and understood that he might be sentenced to death. The defendant denied thinking that he was being watched by the government or that his trial was being scripted. He said that he "fabricated stories" to "achieve certain things at certain times." Dr. Turner–Graham testified that the defendant had an antisocial personality disorder but was "clearly competent to stand trial."

Following the competency hearing, the trial court accredited the testimony of Dr. Bernet and Dr. Turner–Graham and ruled that the defendant was competent to stand trial. The trial court emphasized the following: that the defendant understood the nature of the proceedings; that the defendant understood the nature of the charges against him and the possible punishment; that the defendant was able to assist in his defense by suggesting legal theories and strategy; and that the defendant was able to communicate with his attorneys about his trial. Although the defendant's brain injuries and related conditions made it "difficult" for him to communicate with his attorneys, the trial court found that these difficulties did not render the defendant incompetent to stand trial.

### Defendant's Competency and Burden of Proof

The defendant argues that the trial court erred in finding that he was competent to stand trial and in placing the burden of proof upon him to establish incompetency to stand trial. The State responds that the trial court's rulings were correct.

■■■ The Fourteenth Amendment to the United States Constitution and Article I, section 8 of the Tennessee Constitution prohibit the trial of a person who is mentally incompetent. *Pate v. Robinson*, 383 U.S. 375, 378, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966); *State v. Blackstock*, 19 S.W.3d 200, 205 (Tenn.2000). To be competent to stand trial, a defendant in a criminal case must have " 'the capacity to understand the nature and object of the proceedings against him, to consult with counsel and to assist in preparing his defense.' " *State v. Black*, 815 S.W.2d 166, 174 (Tenn.1991) (quoting *Mackey v. State*, 537 S.W.2d 704, 707 (Tenn.Crim.App.1975)). The trial court's findings "are conclusive on appeal unless the evidence preponderates otherwise." *State v. Oody*, 823 S.W.2d 554, 559 (Tenn.Crim.App.1991).

■■ As a threshold issue, we must determine who bears the burden of proof to establish a defendant's competency or incompetency. Although we have never addressed this precise issue,[5] the Court of Criminal Appeals has concluded that the burden of establishing incompetence to stand trial rests with the defendant. *Oody*, 823 S.W.2d at 559.[6] In *Oody*, the

---

**5.** This Court's decisions in *State v. Black*, 815 S.W.2d 166 (Tenn.1991), and *Jordan v. State*, 124 Tenn. 81, 135 S.W. 327 (1911), did not squarely address the issue. Instead, the holding in *Black* upheld the trial court's decision that the defendant was competent, *see Black*, 815 S.W.2d at 173, and the holding in *Jordan*

involved a plea of insanity as a defense to the charged offense. *Jordan*, 135 S.W. at 329.

**6.** A variety of approaches are taken in other jurisdictions. Many place the burden of proof on the defendant to establish his or her incompetency either by statute or case law. *See* Colo.Rev.Stat. Ann. § 16–8–111; Conn. Gen.

defendant presented a clinical psychologist who testified that the defendant was borderline retarded, psychotic, and incompetent to be tried. The State, on the other hand, presented testimony from two psychologists who stated that the defendant was malingering and was competent, as well as the testimony of officers who related the defendant's ability to communicate to them. The Court of Criminal Appeals placed the burden on the defendant to establish incompetence by a preponderance of the evidence and upheld the trial court's finding that the defendant was competent to stand trial. *Id.* at 559–60; *see also State v. Leming,* 3 S.W.3d 7, 14 (Tenn.Crim.App.1998) (applying same standard).

The *Oody* standard is consistent with the United States Supreme Court's holding that defendants may properly be required to establish their incompetency by a preponderance of the evidence. *Medina v. California,* 505 U.S. 437, 446, 112 S.Ct. 2572, 120 L.Ed.2d 353 (1992). In *Medina,* the Court held that a statute requiring defendants to establish their incompetency by a preponderance of the evidence did not violate due process. In reaching that conclusion, the Court observed:

> Based on our review of the historical treatment of the burden of proof in competency proceedings, the operation of the challenged rule, and our precedents, we cannot say that the allocation of the burden of proof to a criminal defendant to prove incompetence "offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental."

Stat. Ann. § 54–56d; Mo. Ann. Stat. § 552.020; Pa. Cons.Stat. Ann. tit. 50, § 7403; R.I. Gen. Laws § 40.1–5.3–3; Utah Code Ann. § 77–15–5; Va.Code Ann. § 19.2–169.1; *State v. Kleypas,* 272 Kan. 894, 40 P.3d 139 (2001), overruled on other grounds by

*Id.* (quoting *Patterson v. New York,* 432 U.S. 197, 202, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977)). Moreover, the Court emphasized that "[o]nce a State provides a defendant access to procedures for making a competency evaluation, ... we perceive no basis for holding that due process further requires the State to assume the burden ... of persuading the trier of fact that the defendant is competent to stand trial." *Id.* at 449, 112 S.Ct. 2572.

In contrast, the United States Supreme Court has invalidated an Oklahoma statute that required defendants to prove their incompetency by clear and convincing evidence. *Cooper v. Oklahoma,* 517 U.S. 348, 369, 116 S.Ct. 1373, 134 L.Ed.2d 498 (1996). In reaching its holding, the Court observed that forty-six states and the federal government either required the prosecution to establish a defendant's competency or required defendants to establish incompetency by a preponderance of the evidence. *Id.* at 360–62, 116 S.Ct. 1373. The Court further emphasized that the "clear and convincing evidence standard affects a class of cases in which the defendant has already demonstrated that he is more likely than not incompetent." *Id.* at 364, 116 S.Ct. 1373.

We have reviewed the approaches taken in other jurisdictions, and in our view the better reasoned choice is the standard that requires defendants to establish their incompetency by a preponderance of the evidence. This standard was identified by the Court of Criminal Appeals in 1991, and it has been applied since that time with no apparent difficulty or prejudice to either the defense or the prosecution. *Oody,* 823 S.W.2d at 559; *Leming,* 3 S.W.3d at 14.

*State v. Marsh,* 278 Kan. 520, 102 P.3d 445 (2004). Others place the burden on the prosecution. *See* Ill. Comp. Stat. Ann. ch. 725 § 5/104–11; S.D. Codified Laws § 23A–10A–6.1; Wis. Stat. Ann. § 971.14.

Indeed, placing the preponderance burden on defendants appears to strike an appropriate balance in several respects:

> After balancing the equities ... the burden of proof may constitutionally rest on the defendant.... The main concern of the prosecution ... is that a defendant will feign incompetence in order to avoid trial. If the burden of proving incompetence rests on the government, a defendant will have less incentive to cooperate in psychiatric investigations.... A defendant may also be less cooperative in making available friends or family who might have information about the defendant's mental state. States may therefore decide that a more complete picture of a defendant's competence will be obtained if the defense has the incentive to produce all the evidence in its possession.

*Medina*, 505 U.S. at 455, 112 S.Ct. 2572 (O'Connor, J., concurring). Finally, the preponderance of the evidence standard is consistent with due process. *Id.* at 446, 112 S.Ct. 2572.

■ In applying these principles to this case, we conclude that the evidence in the record does not preponderate against the trial court's finding that the defendant was competent to stand trial.[7] The trial court held an exhaustive evidentiary hearing and considered the expert testimony of Dr. Auble, Dr. Amador, Dr. Bernet, and Dr. Turner–Graham. The trial court found that the defendant suffered from a brain injury and had difficulties communicating at times. The trial court further found, however, that the defendant understood the nature of the proceedings, understood the charges against him, and communicat-

ed with his attorneys by suggesting defenses. The fact that not all of the defendant's defense strategies or suggestions were pursued does not indicate that he lacked the ability to assist in his defense. In short, the trial court heard the evidence and accredited the testimony of Dr. Bernet and Dr. Turner–Graham. After carefully reviewing the record, we conclude that the evidence does not preponderate against the trial court's finding that the defendant was competent to stand trial.

*Competency and Exclusion of Evidence*

■ In a related issue on competency, the defendant argues that the trial court erred in excluding the testimony of Reverend Joe Ingle, a minister who had visited with the incarcerated defendant, and the testimony of Mary Ann Hea, a social worker for the public defender's office who had interviewed the defendant several times. The defendant maintains that these witnesses would have supported his claim of incompetency. The State argues that the trial court did not err in excluding these witnesses because the defendant asserted applicable privileges that prevented them from testifying.

The record shows that the defense called Reverend Ingle to testify at the competency hearing. According to defense counsel, Ingle would have testified that he met with the defendant on numerous occasions and that the defendant often tried to portray himself as normal. Ingle would have further testified that the defendant had bizarre, delusional thoughts and that the defendant was the most mentally ill prisoner he had ever counseled. The trial court refused to allow Ingle to testify, however,

---

7. Indeed, we note that the trial court, out of an abundance of caution, evaluated the evidence and reached the same conclusion under two separate standards: placing the burden on the defendant to establish incom-petency by a preponderance of the evidence and placing the burden on the State to establish competency by a preponderance of the evidence.

because the defendant declined to waive the clergy-penitent privilege. *See* Tenn. Code Ann. § 24–1–206 (2000).

Similarly, the record shows that the defense called Mary Ann Hea during the competency hearing to testify about her numerous interviews with the defendant as a social worker for the public defender. After determining that Hea was part of the defense team, the trial court refused to allow her to testify because the defendant declined to waive the applicable privilege, i.e., the attorney-client privilege.

In our view, the trial court did not err in excluding the testimony. First, our conclusion that a defendant bears the burden of establishing his or her incompetency necessarily means that he or she has not been found to be incompetent before or during the competency proceeding itself. As a result, nothing prevents a defendant from invoking an applicable privilege during a competency proceeding as a matter of law. Moreover, the trial court is free to reconsider the issue of the defendant's invocation of privileges while evidence of the defendant's mental status is presented during the hearing by both the defense and prosecution.

Second, a defendant's right to present evidence to meet the burden of proof does not eliminate the trial court's discretion in determining relevance and materiality of the evidence. Here, the defendant presented extensive expert testimony to show that he was not competent to stand trial. The expert witnesses related the basis of their opinions, which included analysis of the defendant's family background, history of head injuries, and mental illness. Dr. Auble, for instance, testified that evidence was gathered not only from the defendant but also the defendant's attorneys, jury consultant, and investigators. Dr. Auble and Dr. Amador testified effectively on behalf of the defense; Dr. Bernet and Dr.

Turner–Graham likewise testified fully and effectively on behalf of the prosecution. In sum, the defendant's exercise of his privileges did not prevent the trial court from fully considering the material evidence and making a thorough assessment of the relevant issues pertaining to the defendant's competency to stand trial. Accordingly, we conclude that the trial court did not err in excluding the testimony of the witnesses.

### Competency and the Court–Appointed Expert

█ The defendant next argues that the trial court erred in denying his motion for a new competency proceeding on the ground that the court-appointed expert, Dr. Cynthia Turner–Graham, allegedly knew one of the victims. The State maintains that there was no evidence establishing that Dr. Turner–Graham had a conflict of interest or that the defendant was prejudiced in any way.

As part of a motion for a new trial, the defendant introduced the affidavit of an Assistant Public Defender, Gary C. Tamkin. The affidavit stated that Tamkin and Dr. Turner–Graham were friends and that the latter had told him "she believed she had met one of the victims." According to Tamkin's affidavit, Dr. Turner–Graham said that her son knew one of the victims and that the victim had been to her house.

In denying the motion for new trial, the trial court found it "inconceivable" that an assistant public defender in possession of such information would wait until after trial to reveal it to his colleagues. The trial court further noted that the defense had presented no testimony in support of the issue and had failed to establish "when, how well, or for how long" Dr. Turner–Graham knew one of the victims. The Court of Criminal Appeals upheld the trial court's ruling.

In our view, the record supports the trial court's ruling. The defendant failed to show that Dr. Turner–Graham had a conflict of interest or that her testimony was affected by allegedly meeting one of the victims. The defendant failed to produce any facts with regard to Dr. Turner–Graham's knowledge of the victim and failed to establish any prejudice resulting from Dr. Turner–Graham's testimony. Moreover, the record reveals that the trial court conducted a full and fair competency proceeding and fully considered the extensive evidence presented by both the defendant and the prosecution. We conclude that the trial court did not err in denying the motion for a new trial and a new competency hearing.

## Guilt Phase Issues

### Sufficiency of Evidence

■ The defendant argues that there was insufficient evidence of premeditation and deliberation to support the first degree murder convictions. The State maintains that the evidence was sufficient to support the convictions.

■ When evaluating the sufficiency of the evidence, we must determine whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (emphasis in original). We are required to afford the prosecution the strongest legitimate view of the evidence in the record, as well as all reasonable and legitimate inferences which may be drawn therefrom. *See State v. Bland*, 958 S.W.2d 651, 659 (Tenn.1997). Questions concerning the credibility of the witnesses, the weight to be given the evidence, and factual issues raised by the evidence are resolved by the trier of fact. *Id.; see also State v. Cazes*, 875 S.W.2d 253, 259 (Tenn.1994). Moreover, these

principles of review apply even if a conviction is based upon circumstantial evidence. *State v. Cole*, 155 S.W.3d 885, 897 (Tenn. 2005).

The offense of first degree murder includes a "premeditated and intentional killing of another." Tenn.Code Ann. § 39–13–202(a)(1) (2003). A premeditated act is "an act done after the exercise of reflection and judgment" and means that "the intent to kill must have been formed prior to the act itself." Tenn.Code Ann. § 39–13–202(d) (2003). An intentional act refers to "the nature of the conduct or to a result of the conduct when it is [a] person's conscious objective or desire to engage in the conduct or cause the result." Tenn.Code Ann. § 39–11–106(a)(18) (2003).

■ In *Bland*, we identified and discussed circumstances that, if established by the proof, may warrant the trier of fact to find or infer premeditation. The circumstances include the use of a deadly weapon upon an unarmed victim, the particular cruelty of a killing, any threats or declarations of intent to kill made by the defendant, proof that the defendant procured a weapon, any preparations to conceal the crime undertaken before the crime is committed, and the defendant's calm demeanor immediately after a killing. *Bland*, 958 S.W.2d at 660.

We agree with the Court of Criminal Appeals' conclusion that the evidence was sufficient to support the first degree murder convictions. There was extensive evidence connecting the defendant to the crimes: the defendant was near the Baskin Robbins store at approximately the time the two victims had been closing the store on April 23, 1997; several witnesses saw a red car similar to the defendant's car; and credit card receipts revealed that the defendant had purchased gasoline at a Texaco station that was minutes away

from Baskin–Robbins. There was also extensive evidence connecting the defendant to the victims: the defendant or his car had been seen at or near the Dunbar Cave area in which the victims' bodies were found; blood found on the defendant's left shoe had a DNA profile that was consistent with that of Angela Holmes; blood found on the defendant's right shoe had a DNA profile that did not exclude the defendant or the victims; and fibers found on the clothing of Holmes and Michelle Mace were consistent with fibers found in the defendant's car. Finally, there was evidence that the defendant had acted with intent and with premeditation: the victims had suffered deep, penetrating stab wounds to their throats; the stab wounds had been inflicted with enough force to penetrate the victims' spines; the stab wounds had been inflicted with a knife blade several inches long; and the victims bled to death in a secluded area. *See State v. Keough,* 18 S.W.3d 175, 181 (Tenn. 2000) (upholding a finding of premeditation based on the nature of the killing where a defendant stabbed the victim to death with a large knife).

The defendant characterizes the evidence as circumstantial and emphasizes inconsistent statements made by witnesses, inconsistent descriptions of the defendant's car, and other alleged discrepancies in the evidence. However, it is the jury's function to weigh the credibility of the witnesses and to resolve the factual conflicts in the evidence. Our task is to review the legal sufficiency of the evidence under the standards stated above.

Accordingly, we conclude that the evidence was sufficient to support the two convictions for first degree murder. Similarly, we conclude that the evidence was sufficient to support the defendant's convictions for especially aggravated kidnapping, *see* Tenn.Code Ann. § 39–13–305(a) (2003), and especially aggravated robbery. *See* Tenn.Code Ann. § 39–13–403(a) (2003).

*Motion to Dismiss Indictment*

 The defendant asserts that the trial court erred in failing to dismiss the indictment because the indictment did not charge the aggravating circumstances used to seek the death penalty. The defendant, citing *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and *Ring v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), argues that aggravating circumstances must be charged in the indictment, submitted to the jury, and established beyond a reasonable doubt. The State maintains that Tennessee's capital sentencing scheme does not require aggravating circumstances to be charged in the indictment.

In *Apprendi,* the United States Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490, 120 S.Ct. 2348. In *Ring,* the Supreme Court addressed the capital sentencing scheme in Arizona, under which guilt or innocence was determined by a jury and the presence of aggravating factors required for the imposition of the death penalty was determined by a trial judge. Relying on *Apprendi's* holding that the *Sixth Amendment* required a jury determination of any facts that would expose a defendant to a penalty exceeding the maximum, the Court found Arizona's scheme unconstitutional. *Ring,* 536 U.S. at 609, 122 S.Ct. 2428. As in *Apprendi,* however, the Court did not apply the *Fifth Amendment* right to presentment or grand jury indictment; instead, the Court reiterated that the Fourteenth Amendment "has not ... been

construed to include the Fifth Amendment right to 'presentment or indictment of a Grand Jury.'" *Ring*, 536 U.S. at 597 n. 4, 122 S.Ct. 2428 (quoting *Apprendi*, 530 U.S. at 477 n. 3, 120 S.Ct. 2348).

As the parties recognize, this Court has consistently held that *Apprendi* does not affect capital sentencing in Tennessee and does not require aggravating circumstances to be pled in an indictment. *See State v. Leach*, 148 S.W.3d 42, 59 (Tenn. 2004); *State v. Berry*, 141 S.W.3d 549, 562 (Tenn.2004); *State v. Holton*, 126 S.W.3d 845, 863 (Tenn.2004); *State v. Dellinger*, 79 S.W.3d 458, 467 (Tenn.2002). In addition, we have clarified that *Ring*, as well as the more recent decision in *Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), "do not change our analysis ... regarding whether aggravating circumstances must be pled in the indictment." *Berry*, 141 S.W.3d at 560; *State v. Davis*, 141 S.W.3d 600, 616 (Tenn. 2004). As we explained in *Berry*, "[t]he focus in *Apprendi*, *Ring*, and *Blakely* was on the Sixth Amendment right to trial by jury," and "the Court expressly declined to impose the Fifth Amendment right to presentment or grand jury indictment upon the States." *Berry*, 141 S.W.3d at 560.[8] Moreover, we emphasized that defendants in capital cases receive written notice of the State's intent to seek the death penalty prior to trial, as well as written notice of the aggravating circumstances, under Rule 12.3 of the Tennessee Rules of Criminal Procedure. *Id.* at 562.

In short, we have held repeatedly that Tennessee's capital sentencing scheme does not require that aggravating circumstances be included in an indictment. The defendant's arguments, therefore, are without merit.

## Amendment of the Indictment

■ The defendant also argues in a related indictment issue that the trial court erred in allowing the indictment to be amended to change the predicate felony underlying the two counts of felony murder from "especially aggravated robbery" to "robbery." The State responds that the trial court did not err because the amended indictment did not include a new or different charge.

We conclude that the trial court did not err in allowing the State to amend the indictment. First, an indictment may be amended without the defendant's consent before jeopardy attaches if "no additional or different offense is thereby charged and no substantial rights of the defendant are thereby prejudiced." Tenn. R.Crim. P. 7(b). Second, the indictment initially charged that two counts of felony murder occurred in the course of "especially aggravated robbery"; the amendment stated that the two counts of felony murder occurred during the course of "robbery," which is simply a lesser included offense of "especially aggravated robbery." Tenn. Code Ann. §§ 39–13–401; –403 (2003). As a result, no new or different offenses were alleged; to the contrary, the amended indictment, like the original indictment, charged two counts of felony murder pursuant to Tennessee Code Annotated section 39–13–202(a)(2).

The defendant also argues that he was prejudiced because the amended indictment no longer required the State to prove the elements of especially aggravated robbery. We disagree. The State was required by the amended indictment to prove the required elements of the charged offenses, i.e., felony murder. Because the amended indictment did not

---

**8.** Furthermore, we noted that the majority of states have likewise declined to require the inclusion of aggravating circumstances in the indictment. *Berry*, 141 S.W.3d at 561 n. 4.

charge new or different offenses, *see* Tenn. R.Crim. P. 7(b), the defendant had notice of the charges and their required elements. *State v. Hammonds,* 30 S.W.3d 294, 300 (Tenn.2000) (stating that notice is the purpose of an indictment). Finally, the defendant's convictions for two counts of felony murder were merged with his convictions for two counts of premeditated first degree murder. In sum, the trial court did not err, and the defendant is entitled to no relief on this ground.

### Extrinsic Evidence of Prior Inconsistent Statements

The defendant contends that the trial court erred in excluding extrinsic evidence of inconsistent statements offered during the testimony of Sgt. R.W. Knight to impeach two of the State's witnesses. *See* Tenn. R. Evid. 613(b). The State responds that the trial court did not abuse its discretion and that any error was harmless.

We begin our review of this issue by summarizing the relevant portions of the transcript. The defense questioned the State's witness, Sgt. R.W. Knight, about statements made to him by a witness for the prosecution, Jay Smith. Although Smith had testified that he saw a car similar to the defendant's at Dunbar Cave on the night of April 23, 1997, and said that he did not recall contacting the police, Sgt. Knight testified that Smith had called the police on May 1, 1997, to provide the license number of a car he had seen at Dunbar Cave. Sgt. Knight further testified that the license number provided by Smith did not belong to the defendant.

Similarly, the defense questioned Sgt. Knight about prior statements made by another witness for the prosecution, Lavanda Zimmerman. Zimmerman had tes-

tified that she saw a car similar to the defendant's in the Baskin–Robbins parking lot on the night of April 23, 1997, but said that police officers did not ask her whether she had seen any cars at that time. Sgt. Knight testified, however, that the police asked Zimmerman whether any cars had been in the parking lot.

The trial court denied the defendant's request to introduce Sgt. Knight's written summaries of the interviews with Smith and Zimmerman, even though the defendant had asked Sgt. Knight about the witnesses' statements and had properly moved that the summaries be admitted into evidence during Sgt. Knight's testimony. The trial court concluded that evidence of a prior inconsistent statement may be introduced only by either (1) using a second witness to relate the prior inconsistent statements or (2) using extrinsic evidence of the prior statement during the examination of the witness who is being impeached. The Court of Criminal Appeals held that the trial court did not abuse its discretion because Sgt. Knight's written summaries were cumulative to his testimony in court.

Extrinsic evidence of a witness's prior inconsistent statement "is not admissible unless and until the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require." Tenn. R. Evid. 613(b). The Advisory Commission Comments to Rule 613(b) clarify that the "only requirement" for the use of extrinsic evidence is that the witness must be "afforded an opportunity to explain or deny."[9] The extrinsic evidence may be "the written or recorded

---

**9.** An additional limitation, however, is that extrinsic evidence may not be used where the trial court determines that the extrinsic evidence concerns a collateral matter. Neil Cohen et al., *Tennessee Law of Evidence,* § 613.5 (4th ed.2003).

content of the prior statement itself or the testimony of another witness as to the content of the prior written or oral statement." Neil Cohen et al., *Tennessee Law of Evidence*, § 613.4 (4th ed.2003).

■■■ In our view, the trial court erred in concluding that the defendant could not introduce the written summaries of the statements made by Smith and Zimmerman to Sgt. Knight. Rule 613(b) requires only that the witnesses be given an opportunity to explain or deny their prior statement. This requirement was met during the defense's cross-examination of Smith and Zimmerman during the State's proof regarding their prior statements. Moreover, Rule 613(b) does not expressly limit the impeaching party to one form of extrinsic evidence, nor does it require an impeaching party to choose between two available forms of extrinsic evidence. In short, the trial court's ruling, which limited the defense to the use of the testimony of Sgt. Knight and precluded the use of the witnesses' statements, was erroneous under Rule 613(b).

■■■ We also conclude, however, that the trial court's error did not affect the result of the proceeding. The defendant attempted to elicit inconsistencies between Smith and Zimmerman's in-court testimony and their prior statements. The defendant asked both Smith and Zimmerman about their prior statements on cross-examination; thus, both witnesses were given an opportunity to explain or deny their statements. The defense then used Sgt. Knight's testimony as extrinsic evidence of the prior inconsistent statements made by Smith and Zimmerman. Although there were written summaries of the witnesses' prior statements, the defense did not establish that the written summaries would have been more effective than Sgt. Knight's testimony or otherwise critical to the defense. In sum, the trial court's er-

ror was harmless, and the defendant, therefore, is not entitled to relief on this issue.

## Penalty Phase Issues

### *Sufficiency of Aggravating Circumstances*

The defendant contends that the evidence was insufficient to support the jury's application of the "heinous, atrocious, or cruel" aggravating circumstance set forth in Tennessee Code Annotated section 39–13–204(i)(5) (2003). The State maintains that the evidence was sufficient to support the jury's application of this aggravating circumstance.

■■■ Our analysis requires that we determine whether, after viewing the evidence in a light most favorable to the State, a rational trier of fact could have found the existence of the aggravating circumstance beyond a reasonable doubt. *Terry v. State*, 46 S.W.3d 147, 160–61 (Tenn.2001). Although the defendant has challenged only one of the three aggravating circumstances in this case, we will address each in turn. *See* Tenn.Code Ann. § 39–13–206(c)(1)(B) (2003) (requiring review of aggravating circumstances found by the jury).

#### 1. *Tennessee Code Annotated section 39–13–204(i)(2)*

■■■ The aggravating circumstance found in Tennessee Code Annotated section 39–13–204(i)(2) (2003) is as follows: "The defendant was previously convicted of one (1) or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person[.]" The plain statutory language requires the prosecution to prove that the defendant had (1) a prior conviction, (2) for a felony offense, (3) whose statutory elements in-

volved the use of violence to a person. *Davis* 141 S.W.3d at 618.

In this case, the prosecution established this aggravating circumstance by relying on the defendant's prior convictions in Tennessee for two counts of first degree murder and one count of especially aggravated robbery. These three convictions were clearly felony offenses whose statutory elements involved the use of violence to the person. *See* Tenn.Code Ann. §§ 39–13–202(a); –403. The prosecution also relied on the defendant's prior conviction in Texas for the offense of aggravated robbery, which the parties stipulated was a violent felony.

Accordingly, the evidence was sufficient to support the jury's application of this aggravating circumstance beyond a reasonable doubt.

### 2. Tennessee Code Annotated section 39–13–204(i)(5)

█ The aggravating circumstance in Tennessee Code Annotated section 39–13–204(i)(5) applies where the "murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death." The defendant argues that this aggravating circumstance should not have been applied because the facts of this case were not as severe or aggravated as other cases in which this aggravating circumstance has been applied.

"Torture" has been defined as "the infliction of severe mental or physical pain upon the victim while he or she remains alive and conscious." *State v. Williams,* 690 S.W.2d 517, 529 (Tenn.1985). "Serious physical abuse beyond that necessary to produce death" has been defined as follows:

> The word "serious" alludes to a matter of degree. The abuse must be physical, as opposed to mental, and it must be

"beyond that" or more than what is "necessary to produce death." "Abuse" is defined as an act that is "excessive" or which makes "improper use of a thing," or which uses a thing "in a manner contrary to the natural or legal rules for its use."

*State v. Odom,* 928 S.W.2d 18, 26 (Tenn. 1996) (quoting Black's Law Dictionary 11 (6th ed.1990)); *see also State v. Morris,* 24 S.W.3d 788, 797 (Tenn.2000).

In this case, the evidence supports a finding of torture and serious physical injury beyond that necessary to produce death. Both victims were stabbed multiple times. Both victims were stabbed in the throat or neck with such severe force that the murder weapon penetrated bone; indeed, the wounds inflicted on Michelle Mace included five cuts to her vertebral column as a result of a "sawing" motion. Both victims were alive and conscious for five to fifteen minutes as they bled to death in great pain. In sum, the evidence was sufficient to support the jury's application of this aggravating circumstance beyond a reasonable doubt. *See State v. Mann,* 959 S.W.2d 503, 511 (Tenn.1997) (victim beaten, strangled, and stabbed eleven times).

### 3. Tennessee Code Annotated section 39–13–204(i)(6)

█ The aggravating circumstance in Tennessee Code Annotated section 39–13–204(i)(6) applies where a "murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another." Section 204(i)(6) focuses on a defendant's motives in committing a murder, and it is not limited to the killings of eyewitnesses or those witnesses who know or can identify the defendant. *See Terry,* 46 S.W.3d at 162. Moreover, the defen-

dant's desire to avoid arrest or prosecution need not be the sole motive for killing the victim and instead may be just one of the purposes motivating the defendant to kill. *Id.; see also Davis,* 141 S.W.3d at 618–19.

Here, the victims were robbed, kidnapped, taken to a remote area, stabbed, and abandoned. The evidence supported a finding that one of the defendant's purposes in committing the murders was to avoid arrest or prosecution for the robbery and kidnapping offenses. Accordingly, the evidence was sufficient to support the jury's application of this aggravating circumstance beyond a reasonable doubt.

### Proportionality

Where a defendant has been sentenced to death, we must apply a comparative proportionality analysis pursuant to Tennessee Code Annotated section 39–13–206(c)(1)(D) (2003). The analysis identifies aberrant, arbitrary, or capricious sentencing by determining whether the death sentence is " 'disproportionate to the punishment imposed on others convicted of the same crime.' " *Bland,* 958 S.W.2d at 662 (quoting *Pulley v. Harris,* 465 U.S. 37, 42–43, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984)).

■■■ In conducting this analysis, this Court employs the precedent-seeking method of comparative proportionality review, in which we compare a case with other cases involving similar defendants and similar crimes. *See Bland,* 958 S.W.2d at 665–67. While no defendants or crimes are alike, a death sentence is disproportionate if a case is "plainly lacking in circumstances consistent with those in cases where the death penalty has been imposed." *Id.* at 668.

We have repeatedly held that the pool of cases considered by this Court in its proportionality review *includes those first degree murder cases in which the State seeks the death penalty,* a capital sentencing hearing is held, and the sentencing jury determines whether the sentence should be life imprisonment, life imprisonment without the possibility of parole, or death. *See State v. Godsey,* 60 S.W.3d 759, 783 (Tenn.2001). We have explained that the pool does not include first degree murder cases in which a plea bargain is reached with respect to the punishment or in which the State does not seek the death penalty:

> [C]onsideration of cases in which the State, for whatever reasons, did not seek the death penalty would necessarily require us to scrutinize what is ultimately a discretionary prosecutorial decision. We previously have declined to review the exercise of prosecutorial discretion, and it would be particularly inappropriate to do so in conducting comparative proportionality review, where our function is limited to identifying aberrant death sentences, not identifying *potential* capital cases.

*Id.* at 784 (citations omitted) (emphasis added).

■■■ Accordingly, our comparative proportionality review of the applicable pool of cases considers numerous factors regarding the offense: (1) the means of death; (2) the manner of death; (3) the motivation for the killing; (4) the place of death; (5) the victim's age, physical condition, and psychological condition; (6) the absence or presence of premeditation; (7) the absence or presence of provocation; (8) the absence or presence of justification; and (9) the injury to and effect upon nondecedent victims. *Bland,* 958 S.W.2d at 667. We also consider numerous factors about the defendant: (1) prior criminal record, if any; (2) age, race, and gender; (3) mental, emotional, and physical condition; (4) role in the murder; (5) cooperation with authorities; (6) level of remorse;

(7) knowledge of the victim's helplessness; and (8) potential for rehabilitation. *Id.; see also State v. Bane,* 57 S.W.3d 411, 428–29 (Tenn.2001).

In this case, we begin by reviewing the nature of the offenses. The defendant robbed and kidnapped the victims in Clarksville, Tennessee, on April 23, 1997. The defendant drove the victims to a secluded area and stabbed them to death. The victims suffered deep, penetrating stab wounds to their throats. The stab wounds had been inflicted with a knife blade several inches long with enough force to penetrate their spines. The victims were alive five to fifteen minutes after being stabbed and were conscious for eighty percent of that time as they bled to death. The defendant's conduct was intentional and premeditated. He acted alone in these offenses, without any evidence of provocation or justification.

We next consider evidence regarding the defendant and his background. The defendant was unemployed at the time of these offenses, and he had prior convictions for first degree murder, especially aggravated robbery, and robbery. He also had a history of mental illness and brain damage stemming from a number of head injuries. Dr. Xavier Amador testified that the defendant suffered from chronic schizophrenia of the paranoid type, a cognitive disorder, documented brain damage, and mental illness characterized by aggressive and impulsive behavior. Dr. Pamela Auble testified that the defendant's brain damage caused the defendant's significant mental disorders and resulted in pervasive impairments in the defendant's behavior, that the defendant had difficulty thinking, exhibited aggression, psychosis, and delusions, and that he believed he was under government surveillance and control. Dr. Robert Kessler testified that the defendant had several brain abnormalities, including traumatic brain injuries, that bore a strong statistical association to psychotic disorders. Although mental health professionals testified that the defendant was schizophrenic and delusional, there was also evidence regarding the defendant's history of malingering. Finally, no evidence was presented to show that the defendant cooperated with the authorities, exhibited remorse for the killings, or was amenable to rehabilitation.

For the following reasons, we conclude that the death sentence as applied to the defendant in this case was not excessive or disproportionate when compared to defendants in other cases. *See* Tenn.Code Ann. § 39–13–206(c)(1)(A), (C), (D) (2003).

First, this Court has upheld death sentences in numerous similar cases where the defendant stabbed a victim or victims. *See Leach,* 148 S.W.3d at 42; *Keough,* 18 S.W.3d at 183; *State v. Bush,* 942 S.W.2d 489 (Tenn.1997); *State v. Hines,* 919 S.W.2d 573 (Tenn.1995); *State v. Thompson,* 768 S.W.2d 239 (Tenn.1989); *State v. West,* 767 S.W.2d 387 (Tenn.1989). In several of these cases, like the present case, a victim was stabbed to death in the course of a robbery or other felony. *Leach,* 148 S.W.3d at 60; *Bush,* 942 S.W.2d at 507; *Hines,* 919 S.W.2d at 584; *West,* 767 S.W.2d at 397.

Second, this Court has upheld numerous death sentences in cases involving a defendant with prior convictions for felonies whose statutory elements involved the use of violence to the person, i.e., one of the aggravating circumstances applied by the jury in this case. *See, e.g., Leach,* 148 S.W.3d at 60. As this Court often has said, this aggravating circumstance is "more qualitatively persuasive and objectively reliable than other[ ]" aggravating circumstances. *State v. Howell,* 868 S.W.2d 238, 261 (Tenn.1993).

Likewise, we have upheld the death penalty in similar cases involving the other two aggravating circumstances applied in this case, i.e., the murder was heinous, atrocious or cruel in that it involved torture or serious injury beyond that necessary to produce death, and the murder was committed to avoid or prevent the defendant's arrest or prosecution. *Leach*, 148 S.W.3d at 59 (aggravating circumstance (i)(5)); *Bush*, 942 S.W.2d at 504–05 (aggravating circumstances (i)(5) and (6)); *Hines*, 919 S.W.2d at 584 (aggravating circumstance (i)(5)); *Thompson*, 768 S.W.2d at 252 (aggravating circumstances (i)(5) and (i)(6)).

Finally, we have upheld sentences in numerous cases involving defendants who presented similar evidence of mitigating circumstances. For example, several cases have involved defendants who presented evidence of their family backgrounds or poor childhood environments. *Davis*, 141 S.W.3d at 621; *State v. Middlebrooks*, 995 S.W.2d 550, 552 (Tenn.1999); *Hines*, 919 S.W.2d at 573. Similarly, several similar cases have involved defendants with mental illness. *Middlebrooks*, 995 S.W.2d at 552 (defendant with borderline personality disorder and brain impairment); *Hines*, 919 S.W.2d at 573 (defendant with paranoid personality disorder, dysthymia, and chronic depression); *Cazes*, 875 S.W.2d at 259 (defendant with possible neurological damage); *Smith*, 868 S.W.2d at 561 (defendant with chronic depression, paranoid personality disorder, chronic depressive neurosis, and paranoid delusional disorder); *Howell*, 868 S.W.2d at 262 (defendant with brain damage).

We need not find that this case is exactly like a prior case in every respect, nor must we determine that this case is "more or less" like other similar death penalty cases. Instead, we must identify aberrant death sentences by analyzing whether a capital case plainly lacks circumstances similar to those cases in the pool of cases in which a death sentence has been upheld. Accordingly, for the foregoing reasons, the death sentences imposed on the defendant for the first degree murder offenses in this case are not disproportionate.

*Weighing of Aggravating and Mitigating Circumstances*

■ As explained above, the evidence overwhelmingly supported three aggravating circumstances applied by the jury: that the defendant had previous convictions for felonies whose elements involved violence to the person; that the murders were especially heinous, atrocious or cruel in that they involved torture or physical abuse beyond that necessary to produce death; and the murders were committed by the defendant to avoid arrest or prosecution. The mitigating circumstances included testimony about the defendant's background, head injuries, brain damage, mental illness, and belief that he was under government surveillance.

After reviewing the record and considering the evidence discussed above with regard to proportionality, we conclude that the evidence supported the jury's finding that the aggravating circumstances outweighed mitigating circumstances beyond a reasonable doubt. Tenn.Code Ann. § 39–13–206(c)(1)(C) (2003).

*Capital Sentencing—Rights to Due Process and Confrontation*

■ The defendant argues that Tennessee's capital sentencing scheme violates his rights to due process and confrontation under the United States Constitution because the rules of evidence do not apply and the jury is permitted to hear evidence that is not reliable and trustworthy. *See* Tenn.Code Ann. § 39–13–204(c) (rules of evidence not applicable during penalty

phase). The State responds that the defendant's argument is without merit.

We have recently rejected the argument raised by the defendant. In *Berry*, we observed that under Tennessee Code Annotated section 39–13–204(c), evidence that is relevant to the circumstances of the murder, the aggravating circumstances relied upon by the State, or the mitigating circumstances is admissible if such evidence has probative value in the determination of punishment. *Berry*, 141 S.W.3d at 563–64. Although the statute gives wider discretion to the trial court than normally permitted under the Tennessee Rules of Evidence, we explained:

> [T]he discretion allowed judges and attorneys during sentencing in first degree murder cases is not unfettered. Our constitutional standards require inquiry into the reliability, relevance, value, and prejudicial effect of sentencing evidence to preserve fundamental fairness and protect the rights of both the defendant and the victim's family. The rules of evidence can in some instances be helpful guides in reaching these determinations of admissibility. Trial judges are not, however, required to adhere strictly to the rules of evidence. These rules are too restrictive and unwieldy in the arena of capital sentencing.

*Id.* (quoting *State v. Sims*, 45 S.W.3d 1, 14 (Tenn.2001)).

Accordingly, the standards set forth in Tennessee Code Annotated section 39–13–204(c) allow trial courts to exclude evidence that may violate the constitutional guarantees of due process or confrontation. The defendant's argument, therefore, is without merit.

### Admissibility of Photographs

▮ The defendant argues that the trial court erred in admitting photographs of the victims during the penalty phase of the trial. The defendant contends that the photographs of the victims taken at the crime scene were gruesome and intended to inflame the passions of the jury. The State maintains that the trial court properly admitted the photographs in support of an aggravating circumstance.

▮ A trial court is afforded broad discretion in determining whether to admit photographs of the deceased in a murder prosecution. *State v. Odom*, 137 S.W.3d 572, 588 (Tenn.2004); *State v. Morris*, 24 S.W.3d 788, 810–11 (Tenn.2000). The decision to admit photographs will be reversed only if the trial court has abused its discretion. *Odom*, 137 S.W.3d at 588.

The record shows that the trial court admitted one photograph of each victim at the crime scene. The color photographs showed the deep stab wounds inflicted on the victims' necks. The trial court concluded that the photographs were probative in establishing an aggravating circumstance, i.e., the murders were heinous, atrocious or cruel in that they involved torture or physical abuse beyond that necessary to produce death, and that the probative value of the photographs outweighed the risk of unfair prejudice.

In our view, the trial court did not abuse its discretion. The photographs were relevant to establish an aggravating circumstance and were not introduced for the purpose of inflaming the jury. Though graphic, the photographs were not unduly gruesome or unfairly prejudicial. Moreover, the trial court allowed the admission of only one photograph of each victim to depict the nature and extent of the injuries inflicted by the defendant. Accordingly, the trial court did not abuse its discretion in admitting the crime scene photographs of the victims.

### Failure to Instruct Jury on "Catch-all" Mitigating Provision

■ The defendant argues that the trial court erred in failing to instruct the jury on the "catch-all" mitigating circumstance set out in Tennessee Code Annotated section 39–13–204(j)(9). This statute allows the jury to consider "[a]ny other mitigating factor which is raised by the evidence produced by either the prosecution or defense at either the guilt or sentencing hearing." *Id.* The State responds that the trial court and the Court of Criminal Appeals properly held that the issue was waived because the defendant did not object or include the issue in the motion for new trial.

The record shows that the trial court instructed the jury on numerous statutory and non-statutory mitigating circumstances. Tenn.Code Ann. § 39–13–204(j). The non-statutory mitigating circumstances charged to the jury included the defendant's "history of childhood," "mental illness or emotional disturbance," and "brain injury or damage." Although the defendant correctly asserts that the trial court failed to instruct the jury on the "catch-all" provision noted above, the transcript shows that the trial court gave the following instruction:

> Tennessee law provides that in arriving at the punishment, the jury shall consider as previously indicated, any mitigating circumstances raised by the evidence in the guilt-finding phase, the sentencing phase, or both, which shall include, *but are not limited to*, the following: [specific statutory and non-statutory mitigating circumstances]. No distinction shall be made between the mitigating circumstances listed and those otherwise raised by the evidence.

The defendant did not object to the instructions, nor did the defendant include this issue in his motion for a new trial.

Although a trial court must instruct the jury on the statutory mitigating "catch-all" provision, the omission in this case was not plain error. The trial court instructed the jury on statutory and non-statutory mitigating circumstances that could be considered. The trial court also instructed the jury that mitigating circumstances were "not limited to" the specific statutory and non-statutory factors. In sum, the trial court's instructions as a whole encompassed the statutory "catch-all" provision and informed the jury that it could consider any mitigating circumstances raised by the evidence in the guilt and penalty phases of the trial. Accordingly, the trial court's failure to instruct on the statutory mitigating "catch-all" provision did not affect the substantial rights of the defendant and was not plain error. Tenn. R.Crim. P. 52(b).

### Prosecutorial Misconduct in Penalty Phase

The defendant next contends that the trial court erred in failing to grant a new sentencing hearing due to prosecutorial misconduct during closing argument. The defendant argues that the prosecutor's misconduct included referring to a victim's thoughts, appealing to the jury's passion, using crime-scene photos of the victims on a projector, and telling the jury that the defendant had murdered four people in "cold blood." The State responds that there was no prosecutorial misconduct and that the defendant failed to object to many of the prosecutor's statements.

■ This Court has often observed that "closing argument is a valuable privilege that should not be unduly restricted." *Bane,* 57 S.W.3d at 425. We have likewise recognized that the prosecutor may not engage in derogatory remarks, appeal to the prejudice of the jury, misstate the

evidence, or make arguments not reasonably based on the evidence. *State v. Bates,* 804 S.W.2d 868, 881 (Tenn.1991) (referring to defendant as a "rabid dog"). The trial court has discretion in controlling the course of arguments and will not be reversed absent an abuse of that discretion. *Bane,* 57 S.W.3d at 424.

■■■■ Moreover, prosecutorial misconduct does not amount to reversible error absent a showing that it has affected the outcome of the case to the prejudice of the defendant. *See State v. Chalmers,* 28 S.W.3d 913, 917 (Tenn.2000). In making this determination, we must consider: (1) the conduct complained of viewed in light of the facts and circumstances of the case; (2) the curative measures undertaken by the court and the prosecution; (3) the intent of the prosecutor in making the improper arguments; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength and weakness of the case. *Id.* at 917; *State v. Buck,* 670 S.W.2d 600, 609 (Tenn.1984). We will review each of the defendant's arguments with these standards in mind.

■■■■ The defendant asserts that the prosecutor improperly referred to the thoughts Angela Holmes may have had before she died. The record shows that the prosecutor argued that the victim may have been thinking about her family or her wedding, which had taken place at Dunbar Cave, and that "we can only speculate as to what she was thinking." Although counsel are required to confine their arguments to those supported by the evidence or inferences drawn from the evidence, the defendant did not object to the prosecutor's remarks at trial. Thus, we cannot conclude either that the trial court abused its discretion in allowing the argument or that the prosecutor's argument affected the outcome of the trial.

■■■■ The defendant next argues that the prosecutor engaged in misconduct by using dollar bills to demonstrate the defendant's greed. In denying the motion for new trial, the trial court observed that the prosecutor had asked, "why did this man do this," and had then placed money on a projector while stating, "that's why." The trial court found that the argument had been made in response to the argument that the defendant should not be sentenced to death because of his mental illness. The record shows that the defense did not object to the argument or the prosecutor's conduct at trial. After reviewing the trial court's findings and the record, we cannot conclude that the trial court abused its discretion or that the prosecutor's argument affected the result of the trial.

The defendant argues that the prosecutor engaged in misconduct by placing the crime scene photographs of the victims on a projector. The record shows that the prosecutor stated:

> This is not some crazy offense. This is standard greed. He'd rather kill and rob [than] work. And that's what he did; he killed and robbed, and turned two beautiful little children into this. And it wasn't because of his mental illness or his mother or his father. Because he wanted money.

The record does not, however, reveal the prosecutor's precise actions while making these arguments. Moreover, the defendant did not object to the prosecutor's conduct or make an offer of proof to preserve the record for appellate review. As a result, we cannot conclude that the trial court abused its discretion in allowing the argument or that any misconduct affected the outcome of the trial.

■■■■ Finally, the defendant argues that the prosecutor engaged in misconduct by making references to the underly-

ing facts of the defendant's prior first degree murder convictions. The record shows that the prosecutor stated that the two victims in this case were "the third and fourth persons" the defendant had killed, that the defendant had now killed "four" people, and that the defendant had killed four people "in cold blood." The defendant did not object to the arguments, however, until the prosecutor stated: "I submit to you the fact that this is the third and fourth person he's murdered, that's powerful enough to blow away any mitigating evidence." At that point, the trial court sustained the defendant's objection and instructed the jury to disregard the argument. The trial court later instructed the jury as follows:

> In its closing argument, the State may have implied that the jury should impose death because the defendant has been convicted of killing four people. The defendant has been tried, convicted and sentenced for his prior convictions. You are to consider those convictions only for the purpose of determining whether the State has proven beyond a reasonable doubt the existence of an aggravating circumstance, and for no other purpose.

At the time of the offenses in this case, this Court had consistently held that it was improper for the prosecution to introduce evidence or make arguments based on the facts underlying a prior violent felony conviction being used to establish the aggravating circumstance in Tennessee Code Annotated section 39–13–204(i)(2) where the prior conviction on its face involved violence to the person. *See State v. Bigbee*, 885 S.W.2d 797, 812 (Tenn.1994); *see also Odom*, 137 S.W.3d at 585.[10]

In *Bigbee*, the prosecution introduced the facts underlying the defendant's prior conviction for first degree murder in which the victim had been shot three times, argued that the jury should consider that the defendant had committed two killings, and suggested that the death penalty was appropriate because the defendant already had received a life sentence for the prior murder. *Bigbee*, 885 S.W.2d at 810. This Court remanded for a new sentencing hearing after concluding that the inadmissible evidence and the prosecutorial argument improperly enhanced the aggravating circumstance and affected the jury's determination to the prejudice of the defendant. *Id.* at 812.

Similarly, in *Odom*, the prosecution introduced details of a prior first degree murder committed by the defendant in support of the aggravating circumstance in Tennessee Code Annotated section 39–13–204(i)(2). *Odom*, 137 S.W.3d at 585. The details included testimony from the investigating officer of the prior crime, as well as photographs of the victim of the prior offense. After noting that the prosecution relied heavily on the facts underlying the defendant's prior felony convictions to enhance the effect of this aggravating circumstance during its closing argument, we remanded for a new sentencing proceeding.

We conclude that the prosecutor's arguments in the present case, although error, do not warrant a new sentencing proceeding. Unlike *Bigbee* and *Odom*, the prosecutor did not introduce evidence of the facts underlying the defendant's prior first degree murder convictions. Although the prosecutor repeatedly mentioned that the defendant had now killed four people, the

---

10. In 1998, the legislature amended statutory provisions to allow the prosecution to introduce the facts underlying a prior violent felony being used to seek the death penalty. Tenn.Code Ann. § 39–13–204(c). The amendment is not applicable in this case. *See Odom*, 137 S.W.3d at 585.

jury was aware of the defendant's prior convictions for two counts of first degree murder and was aware that the prosecution was relying on these prior convictions to establish an aggravating circumstance. While the reference to the defendant's killing four people in "cold blood" could be interpreted to mean that the prior first degree murder offenses were similar to the present offenses, that reference alone does not amount to misconduct of the degree and severity described in *Bigbee* and *Odom*. In addition, the trial court properly gave two curative instructions to the jury, which we must presume were followed by the jury. *See State v. Shaw*, 37 S.W.3d 900, 904 (Tenn.2001) (the jury is presumed to follow curative instructions). Although the prosecutor's argument was prosecutorial misconduct and error, the defendant objected, and the trial court sustained the objection and gave curative instructions. Accordingly, we conclude that the trial court did not abuse its discretion and that the prosecutorial misconduct did not affect the outcome of the trial.

## CONCLUSION

After reviewing the record and applicable authority, we hold as follows: 1) the trial court did not err in finding that the defendant was competent to stand trial; 2) the trial court did not err in excluding evidence during the competency hearing; 3) the trial court did not err in refusing to hold a new competency hearing on the basis that a court-appointed expert was biased; 4) the evidence was sufficient to support the defendant's convictions; 5) the trial court did not err in denying the defendant's motion to dismiss on the basis that the aggravating circumstances were not stated in the indictment; 6) the trial court did not err in allowing the prosecution to amend the indictment; 7) the trial court did not commit reversible error in limiting extrinsic evidence of prior incon-

sistent statements; 8) the evidence was sufficient to support the aggravating circumstances found by the jury; 9) the death sentences were not arbitrary or disproportionate as imposed in this case; 10) the evidence was sufficient to support the jury's finding that evidence of aggravating circumstances outweighed evidence of mitigating circumstances; 11) the capital sentencing statutes are not unconstitutional on the basis that they allow evidence to be admitted in violation of due process and confrontation under the United States Constitution; 12) the trial court did not err in admitting crime scene photographs of the victims during sentencing; 13) the trial court did not commit reversible error in failing to charge the jury on the "catch-all" statutory provision as to mitigating circumstances; and 14) the trial court did not err in denying a new trial based on alleged prosecutorial misconduct during sentencing.

The Court of Criminal Appeals' judgment is affirmed. The sentence of death shall be carried out on the 5th day of October, 2005, unless otherwise ordered by this Court or other proper authority.. It appearing that the defendant is indigent, costs of the appeal are taxed to the State.

ADOLPHO A. BIRCH, Jr., J., filed a separate concurring/dissenting opinion.

ADOLPHO A. BIRCH, JR., J., concurring and dissenting.

I concur in the conclusion of the majority that Reid's conviction should be affirmed. As to the sentence of death, however, I respectfully dissent. I continue to adhere to my view that the comparative proportionality review protocol currently embraced by the majority is inadequate to shield defendants from the arbitrary and disproportionate imposition of the death

penalty. *See* Tenn.Code Ann. § 39–13–206(c)(1)(D) (1995 Supp.).

I have repeatedly expressed my displeasure with the current protocol since the time of its adoption in *State v. Bland,* 958 S.W.2d 651 (Tenn.1997). *See State v. Thacker,* 164 S.W.3d 208, 256, 2005 WL 984397 (Tenn., April 27, 2005)(Birch, J., concurring and dissenting); *State v. Thomas,* 158 S.W.3d 361, 384, (Tenn.2005) (Birch, J., concurring and dissenting); *State v. Faulkner,* 154 S.W.3d 48, 64 (Tenn.2005) (Birch, J., concurring and dissenting); *State v. Cole,* 155 S.W.3d 885, 910 (Tenn.2005) (Birch, J., concurring and dissenting); *State v. Robinson,* 146 S.W.3d 469, 529 (Tenn.2004) (Birch, J., concurring and dissenting); *State v. Leach,* 148 S.W.3d, 42, 68 (Tenn.2004) (Birch, J., concurring and dissenting); *State v. Davis,* 141 S.W.3d 600, 632 (Tenn.2004) (Birch, J., concurring and dissenting); *State v. Berry,* 141 S.W.3d 549, 589 (Tenn.2004) (Birch, J., concurring and dissenting); *State v. Holton,* 126 S.W.3d 845, 872 (Tenn.2004) (Birch, J., concurring and dissenting); *State v. Davidson,* 121 S.W.3d 600, 629–36 (Tenn.2003) (Birch, J., dissenting); *State v. Carter,* 114 S.W.3d 895, 910–11 (Tenn.2003) (Birch, J., dissenting); *State v. Reid,* 91 S.W.3d 247, 288–89 (Tenn.2002) (Birch, J., concurring and dissenting); *State v. Austin,* 87 S.W.3d 447, 467–68 (Tenn.2002) (Birch, J., dissenting); *State v. Stevens,* 78 S.W.3d 817, 852 (Tenn.2002) (Birch, J., concurring and dissenting); *State v. McKinney,* 74 S.W.3d 291, 320–22 (Tenn.2002) (Birch, J., concurring and dissenting); *State v. Bane,* 57 S.W.3d 411, 431–32 (Tenn.2001) (Birch, J., concurring and dissenting); *State v. Stout,* 46 S.W.3d 689, 720 (Tenn.2001) (Birch, J., concurring and dissenting); *Terry v. State,* 46 S.W.3d 147, 167 (Tenn.2001) (Birch, J., dissenting); *State v. Sims,* 45 S.W.3d 1, 23–24 (Tenn.2001) (Birch, J., concurring and dissenting); *State v. Keen,* 31 S.W.3d 196, 233–34 (Tenn.2000) (Birch, J., dissenting). As previously discussed, I believe that the three basic problems with the current proportionality analysis are that: (1) the proportionality test is overbroad,[1] (2) the pool of cases used for comparison is inadequate,[2] and (3) review is too subjective.[3] I have previously discussed, in

1. I have urged adopting a protocol in which each case would be compared to factually similar cases in which *either* a life sentence or capital punishment was imposed to determine whether the case is more consistent with "life" cases or "death" cases. *See State v. McKinney,* 74 S.W.3d at 321 (Birch, J., concurring and dissenting). The current protocol allows a finding proportionality if the case is similar to existing *death penalty* cases. In other words, a case is disproportionate only if the case under review "is plainly lacking in circumstances consistent with those in similar cases in which the *death penalty* has been imposed." *Bland,* 958 S.W.2d at 665 (emphasis added).

2. In my view, excluding from comparison that group of cases in which the State did not seek the death penalty, or in which no capital sentencing hearing was held, frustrates any meaningful comparison for proportionality purposes. *See Bland,* 958 S.W.2d at 679

(Birch, J., dissenting). The majority justifies its decision not to include such cases by stating that it would be inappropriate to review the exercise of prosecutorial discretion. However, I note that in a July 2004 study conducted by the State Comptroller on the costs and the consequences of the death penalty, one of the conclusions was that prosecutors across the state are inconsistent in their pursuit of the death penalty. In my view, this inconsistency contributes to arbitrariness in the imposition of the death penalty. *See* John G. Morgan, Comptroller of the Treasury, *Tennessee's Death Penalty: Costs and Consequences* 13 (July 2004), *available at www.comptroller.state.tn.us/orea/reports.*

3. As I stated in my concurring/dissenting opinion in *State v. Godsey,* "[t]he scope of the analysis employed by the majority appears to be rather amorphous and undefined—expanding, contracting, and shifting as the analysis

depth, my perception that these flaws undermine the reliability of the current proportionality protocol. *See State v. Godsey,* 60 S.W.3d at 793–800 (Birch, J., concurring and dissenting). I continue to adhere to my view that the current comparative proportionality protocol is woefully inadequate to protect defendants from the arbitrary or disproportionate imposition of the death penalty. Accordingly, I respectfully dissent from that portion of the majority opinion affirming the imposition of the death penalty in this case.

### APPENDIX

(Excerpts from the Court of Criminal Appeals' Decision)

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT NASHVILLE

October 14, 2003 Session

STATE OF TENNESSEE v. PAUL DENNIS REID, JR.

Direct Appeal from the Circuit Court for Montgomery County

No. 38887 John H. Gasaway, III, Judge

No. M2001–02753–CCA–R3–DD– Filed December 29, 2003

The appellant, Paul Dennis Reid, Jr., was found guilty by a jury of two counts of premeditated murder, two counts of felony murder, two counts of especially aggravated kidnapping, and one count of especially aggravated robbery. The felony murder convictions were merged into the premeditated murder convictions. Thereafter, the jury sentenced the appellant to death based upon the existence of three aggravating circumstances: the appellant had previously been convicted of one or more felonies, other than the present charge, the statutory elements of which involve the use of violence to the person; the murders were committed for the purpose of avoiding, interfering with or preventing a lawful arrest or prosecution of defendant or another; and the murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death. The trial court sentenced the defendant as a violent offender to twenty-five years imprisonment for especially aggravated robbery and especially aggravated kidnapping, to run consecutively to his sentences for first degree murder and to a prior out-of-state sentence. On appeal, appellant presents forty-five issues. After an extensive review of the record and the applicable law, we find that none of these issues warrants a reversal of this case. Therefore, the judgments of the trial court are AFFIRMED.

JERRY L. SMITH, J., delivered the opinion of the court, in which DAVID G. HAYES and THOMAS T. WOODALL, JJ., joined.

James A. Simmons and Thomas F. Bloom, Nashville, Tennessee for the appellant, Paul Dennis Reid, Jr.

Paul G. Summers, Attorney General & Reporter; Michael E. Moore, Solicitor General; Mark E. Davidson, Assistant Attorney General; Victor S. Johnson, District Attorney General; and Arthur F. Bieber, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

**[Deleted: Factual Background]**

*Analysis*

**I. Validity of Search Warrants**

Appellant contends the trial court erred in denying his motion to suppress evidence

moves from case to case." 60 S.W.3d 759, 797 (Tenn.2001) (Birch, J., concurring and dissenting).

seized pursuant to search warrants 145, 146, and 189. Specifically, appellant argues that warrant 145, authorizing the search of his "red 1997 Ford Escort LX four door ... [,]" and warrant 146, authorizing the search of his home located at 1424 Ordway Place, are invalid because they did not describe with particularity the items ultimately seized. Appellant further claims that the warrants are invalid for lack of probable cause due to the passage of time and that the warrants do not establish a nexus between the criminal activity and his home and the criminal activity and his car. Appellant challenges warrant 189 on the grounds that he did not receive an exact copy of the warrant authorizing the police to obtain hair and blood samples from him and that the warrant lacked probable cause because it failed to state that the police obtained blood and hair samples from the victims to compare to his. Appellant raised these same allegations with regard to warrants 146 and 149 on his direct appeal of the Captain D's murders[1] and the Tennessee Supreme Court found these allegations to be without merit.[2] *Reid,* 91 S.W.3d at 273–76.

The Supreme Court set forth a detailed analysis examining the requirement of particularity for search warrants, the requirement of a nexus between the criminal activity and the area to be searched, and the requirement of Tennessee Rule of Criminal Procedure 41 that the serving officer leave a copy of the search warrant with the person on whom the search warrant is being served.

In discussing the particularity required for search warrants, the court stated:

Under both the Fourth Amendment to the United States Constitution and Article I, section 7 of the Tennessee Constitution a search warrant must contain a particular description of the items to be seized. *See State v. Henning,* 975 S.W.2d 290, 296 (Tenn.1998) (citing cases). This requirement serves as a limitation, both upon governmental intrusion into a citizen's privacy and property rights and upon the discretion of law enforcement officers conducting the search. *Id.* To satisfy the particularity requirement, a warrant "must enable the searcher to reasonably ascertain and identify the things which are authorized to be seized." *Henning,* 975 S.W.2d at 296 (internal quotations and citations omitted).

*Reid,* 91 S.W.3d at 273.

The court quoted with approval the following language from *Lea v. State,* 181 Tenn. 378, 181 S.W.2d 351, 352–53 (1944), which sets forth the particularity requirement for search warrants.

[W]here the purpose of the search is to find specific property, it should be so particularly described as to preclude the possibility of seizing any other. On the other hand, if the purpose be to seize not specified property, but any property of a specified character which, by reason of its character, and of the place where and the circumstances under which it may be found, if found at all, would be illicit, a description, save as to such

---

1. The evidence seized from appellant's car and home and the samples taken from appellant's person, which were ultimately used in the trial at issue, were seized as a result of the investigation of the Captain D's murders in Nashville and were introduced as evidence in the Captain D's murder trial.

2. On appeal of his convictions in the Captain D's murders, appellant did not challenge warrant 145, authorizing the search of his car, but the Supreme Court's analysis is equally applicable to warrant 145.

character, place and circumstances, would be unnecessary, and ordinarily impossible.

*Reid,* 91 S.W.3d at 273–74.

Applying the principles set forth in *Lea* to the warrants at issue in *Reid,* the court noted that

> [w]arrants 146 and 149 authorized searches of the defendant's residence for items "which may be identified" as property belonging to the victims or the restaurants, and any items that "may be used to cause the death of the victims." Warrant 149 additionally authorized a search for "any and all financial records to include those indicating" money paid by the defendant on an automobile lease around the time of the murders. An affidavit was attached to each warrant, setting forth the nature and circumstances of the crimes and noting several items that had been taken from the restaurants, including bank bags.

*Id.* at 274. Ultimately, the court affirmed the decisions of the trial court and this Court, which determined that the warrants met the particularity requirement because "the warrants described the character of the property with sufficient particularity 'to enable the searcher to reasonably ascertain and identify' the items subject to seizure." *Id.*

In response to appellant's arguments that the information in the affidavits accompanying the warrants was stale and there was no probable cause to believe that evidence of the crimes would be located at appellant's residence, the court examined the requirement that there be a nexus between the criminal activity and the area to be searched and found that

> To establish probable cause an affidavit must set forth facts from which a reasonable conclusion may be drawn that the evidence will be found in the place for which the warrant authorizes a search. *State v. Vann,* 976 S.W.2d 93, 105 (Tenn.1998); *State v. Longstreet,* 619 S.W.2d 97, 99 (Tenn.1981). In addition, the affidavit must contain information which will allow a magistrate to determine whether the facts are too stale to establish probable cause at the time issuance of the warrant is sought. *Vann,* 976 S.W.2d at 105. While the lapse of time between the commission of a crime and the issuance of a search warrant may affect the likelihood that incriminating evidence will be found, probable cause is a case-by-case determination. *State v. Meeks,* 876 S.W.2d 121, 124 (Tenn.Crim.App.), perm. app. denied (Tenn.1993). In making this determination, courts should consider whether the criminal activity under investigation was an isolated event or a protracted pattern of conduct. Courts also should consider the nature of the property sought, the normal inferences as to where a criminal would hide the evidence, and the perpetrator's opportunity to dispose of incriminating evidence. *State v. Dellinger,* 79 S.W.3d 458, 469–70 (Tenn.2002); *State v. Smith,* 868 S.W.2d 561, 572 (Tenn.1993).

> ... [T]he criminal conduct under investigation was not an isolated event. As indicated in the warrants, the crimes occurred almost one month apart, with the last crime committed on March 23, 1997, less than three months prior to the time the warrants were being sought. The warrants sought any items that had been taken from the restaurants or the victims or that may have been used to cause the death of the victims. The affidavits set out the circumstances of the Captain D's and McDonald's robberies, including the fact that the only person who had survived the crimes had been repeatedly stabbed and left for

dead. The affidavits further noted that the defendant's fingerprint had been recovered from an item belonging to one of the Captain D's victims, that the murder scenes were extremely bloody, that the victims' blood could be on the defendant's clothing, and that the defendant could still have in his possession or on his premises instruments of violence used to murder the victims or personal items belonging to the victims. Clearly, the affidavits provide an explanation for why the items sought by the warrants are capable of, and are in fact, likely to be hidden in the defendant's residence.... Where, as here, a perpetrator believes he has eliminated or incapacitated all witnesses so that law enforcement officials are unlikely to discover his criminal activity, it is neither unreasonable nor unlikely that the perpetrator would keep clothing, or the murder weapons, or items taken during the crime at his residence. *See Smith*, 868 S.W.2d at 572. Therefore, we conclude that the trial court and Court of Criminal Appeals correctly found that the affidavits set forth sufficient facts from which the magistrate reasonably could have concluded that a nexus existed between the crime and the place to be searched and that the facts were sufficiently recent to establish probable cause.

*Reid*, 91 S.W.3d at 275–76.

■ Appellant has not shown how the evidence preponderates against the trial court's findings in this case. "[T]he trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." *State v. Odom*, 928 S.W.2d 18, 23 (Tenn.1996). However, the application of the law to the facts as found by the trial court is a question of law, which the appellate court reviews de novo. *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn.1997).

Appellant concedes that the Supreme Court held two of the search warrants at issue in this case valid in the Captain D's appeal but argues that this court should not follow the reasoning set forth by the Supreme Court because it misinterpreted and misapplied the principles set forth in *Lea*. Appellant argues that the less exacting particularity requirement set forth in *Lea* applies only when the property to be seized is of an illicit or illegal nature. Appellant contends that the danger in failing to abide by the *Lea* court's precise holding is that a more expansive interpretation of the case will result in the "general searches" prohibited by the state and federal constitutions. Appellant maintains that, because the warrants at issue do not comply with the requirements set forth in *Lea*, the warrants are constitutionally defective. This court, however, adopts the reasoning of the Supreme Court in *Reid*, 91 S.W.3d at 273–76, and determines that warrants 145 and 146 are valid.

■ Appellant contends that he did not receive a copy of warrant 189 at the time the warrant was executed in violation of Tennessee Rule of Criminal Procedure 41. In dismissing the identical issue with respect to warrant 149 in *Reid*, the Supreme Court found:

It is undisputed that the officers executing the warrants were aware of the defendant's whereabouts. It is also undisputed that the detectives left a copy of the search warrant locked inside the defendant's residence, from which the property was taken. The rule requires nothing more.... [T]here was no one present on whom the officers could serve the warrant at the time it was executed; therefore, *it was not possible* for the officers to leave a copy with the person being served. Rule 41(c) does

not require officers to deliver a copy of the search warrant to a person who is not present. Instead, subsection (d) of Rule 41 indicates that an officer taking property under a warrant shall "give to the person from whom or from whose premises the property was taken a copy of the warrant and a receipt for the property taken *or shall leave the copy and receipt at a place from which the property was taken.*" (Emphasis added.) In this case, the officers left the warrant at the defendant's residence, the place from which the property was taken. This issue is without merit.

*Reid,* 91 S.W.3d at 276.

In pertinent part, Tennessee Rule of Criminal Procedure 41 provides: "[T]he failure of the serving officer *where possible to leave a copy with the person or persons on whom the search warrant is being served,* shall make any search conducted under said search warrant an illegal search and any seizure thereunder an illegal seizure." Tenn. R.Crim. P. 41 (emphasis added).

Detective Postiglione testified in a pretrial motion hearing that he and Detective Rolland served a copy of warrant 189 on appellant at the Sheriff's Department at the Davidson County Criminal Justice Center. The search warrant shows that it was executed and returned on the same date it was issued, August 6, 1997. Therefore, it appears that Tennessee Rule Criminal Procedure 41(c) was satisfied.

▮ Appellant asserts as a final argument that warrant 189 lacked probable cause to permit seizure of appellant's hair and blood because the warrant failed to state hair and blood samples had been obtained from either of the victims or the crime scenes that could be used to compare to appellant's hair or blood. The warrant states, however, that "Paul Dennis Reid Jr. may have been cut or injured to the point where bleeding occurred, thus leaving his blood either on the victims or in the area [of] the crime scenes. It is also possible that during this contact Paul Dennis Reid Jr. left behind body hairs either on the victims or in the area of the crime scenes." Thus, the warrant provided an explanation for why the items sought may be found on appellant and set forth sufficient facts for a magistrate to reasonably conclude that a nexus existed between the crime and appellant's hair and blood. Based on the reasoning set forth by the Supreme Court in appellant's prior appeal of the Captain D's murders and the reasoning set forth above, this Court finds warrant 189 to be constitutionally valid. This issue is without merit.

## II. Crime Scene Video

Appellant contends that the trial court erred in admitting the videotape of the crime scene into evidence. Specifically, appellant contends that the videotape was not necessary to establish where the bodies were found or the extent of the victims's injuries because the videotape was merely cumulative of testimony of other witnesses. Appellant further contends that the depiction of the crime scene in the videotape was "gruesome and graphic" and, thus, prejudicial. Appellant submits that the only purpose of the video was to inflame and prejudice the jury against appellant.

▮ The admissibility of a videotape of a crime scene is within the sound discretion of the trial judge, and his or her ruling on admissibility will not be disturbed on appeal absent a clear showing of an abuse of that discretion. *State v. Carruthers,* 35 S.W.3d 516, 576–57 (Tenn. 2000), *cert. denied,* 533 U.S. 953, 121 S.Ct. 2600, 150 L.Ed.2d 757 (2001); *State v.*

*Banks,* 564 S.W.2d 947, 949 (Tenn.1978); *see also State v. Bigbee,* 885 S.W.2d 797, 807 (Tenn.1994); *State v. Van Tran,* 864 S.W.2d 465, 477 (Tenn.1993), *cert. denied,* 511 U.S. 1046, 114 S.Ct. 1577, 128 L.Ed.2d 220 (1994). As the Supreme Court stated in *Carruthers,* the modern trend is to vest more discretion in the trial judge's rulings on admissibility. *Carruthers,* 35 S.W.3d at 577 (citing *Banks,* 564 S.W.2d at 949; *State v. Michael Carlton Bailey,* No. 01C01–9403–CC–00105, 1995 WL 424996, at *7 (Tenn.Crim.App. at Nashville, July. 20, 1995), *perm. to appeal denied,* (Tenn. Jan. 8, 1996).

▬ Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Tenn. R. Evid. 403. Prejudicial evidence is not excluded as a matter of law. *Carruthers,* 35 S.W.3d at 577 (citing *State v. Gentry,* 881 S.W.2d 1, 6 (Tenn.Crim.App.1993)). The court must still determine the relevance of the evidence and weigh its probative value against any undue prejudice. *Id.* The term "undue prejudice" has been defined as "[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Banks,* 564 S.W.2d at 950–51. In *Banks,* the Supreme Court gave the trial courts guidance for determining the admissibility of relevant photographic evidence and determined that a trial court should consider: (1) the accuracy and clarity of the picture and its value as evidence; (2) whether the picture depicts the body as it was found; (3) the adequacy of testimonial evidence in relating the facts to the jury; and (4) the need for the evidence to establish a *prima facie* case of guilt or to rebut the defendant's contentions. *Id.*

▬ In this case, the trial court found that the video aided the jury in understanding the testimony of medical examiners, crime scene investigators, and witnesses. The trial court noted that the jury was from Memphis and presumably unfamiliar with the area and Dunbar Cave State Park. The trial court also found that the video depicted the location of the bodies and was shown to document the position of the bodies in relation to the lake, the trail described by investigators and witnesses, the parking lot, and the cave. The trial court determined that the video was not "particularly gruesome." Appellant advances the argument that the video was graphic and gruesome only because the video shows the bodies of the victims as they were found at the crime scene. The crime scene video of most murders will necessarily depict the bodies of the victims as they were found. If this court were to accept appellant's argument in this regard, no crime scene videotapes of murders would ever be admissible.

This Court further concludes that while the videotape and the other evidence admitted in this case may have contained some of the same material, it was not error to admit the videotape. *See Bigbee,* 885 S.W.2d at 807 (holding that it was not error to admit a videotape of the crime scene although it depicted images similar to those of photographs also admitted). Each of the different forms of evidence admitted in this case served different purposes and were probative of the issues to be decided by the jury. As a result, the trial court did not abuse its discretion in admitting the videotape into evidence. *See id.; see also State v. Kelvin Anthony Lee,* No. 02C01–9603–CC–00085, 1997 WL

686258, at *9 (Tenn.Crim.App. at Jackson, Nov. 5, 1997), *perm. to appeal denied,* (Tenn. Aug. 3, 1998.) The probative value of the video of the crime scene is not outweighed by its prejudicial effect. This issue is without merit.

### III. Grand Jury Rough Notes

■ Appellant contends that the trial court erred by refusing to order the State to disclose grand jury testimony. In a pretrial motion, appellant asked the trial court to require disclosure of grand jury testimony, including notes taken by the Assistant Attorney General "for the purpose of ascertaining whether the witness' grand jury testimony is consistent with the testimony given by the witnesses before the court in the trial", at least to the extent that testimony was revealed in rough notes of the testimony taken by the assistant district attorney general. In the alternative, the motion sought for the court to review the notes in-camera to ascertain whether or not the witnesses' testimony was consistent with the testimony that the witnesses gave before the grand jury. The trial court granted appellant's motion to the extent the grand jury testimony was revealed in rough notes taken by the assistant attorney general but denied it as to the disclosure of grand jury testimony. The State responded that it did not possess any rough notes of the grand jury testimony.

On appeal, appellant relies on the exception to the rule of secrecy of grand jury testimony found in Tennessee Rule of Criminal Procedure 6(k)(2), which allows a *member* of the grand jury to be "required by the court to disclose the testimony of a witness examined before them, for the purpose of ascertaining whether it is consistent with that given by the witness before the court," to argue that the trial court

should have ordered the State to disclose its rough notes of the grand jury testimony. Appellant argues that "[b]ecause the trial court's ruling allowed the State to take such an incredible position, . . . the court erred in so ruling." The rule does not require the district attorney's rough notes of grand jury testimony to be turned over to opposing counsel, the rule requires the disclosure of witness testimony for the purpose of ascertaining the consistency of the witness' testimony. Appellant has failed to show any error committed by the trial court. The appellant merely asked for the notes of the testimony that were taken by the prosecutor, and there were no actual allegations of inconsistencies in the grand jury testimony. Moreover, the State cannot produce documents it does not possess. This issue is without merit.

### IV. Limited Jury Questionnaire

Appellant argues that the trial court erred by denying his motion to disseminate a questionnaire to prospective jurors inquiring about the jurors' gender, birth date, educational background, and economic class. Specifically, appellant argues that the court's questionnaire did not cover the topics in sufficient detail to evaluate the representation of cognizable groups, relying upon *Duren v. Missouri,* 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979), which holds that a defendant has a right to challenge the venire to ensure adequate representation of cognizable groups.

■ Appellant fails to cite to the portion of the appellate record containing the questionnaire he requested be disseminated to the jury. Further, it does not appear that the questionnaire submitted to the jurors by the trial court was made a part of the appellate record. "Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as

waived in this court." Tenn. R. Ct.Crim. App. 10(b).

Moreover, the control of voir dire proceedings rests within the sound discretion of the trial court, and this court will not interfere with the exercise of this discretion unless clear abuse appears on the face of the record. *State v. Howell*, 868 S.W.2d 238, 247 (Tenn.1993), *cert. denied*, 510 U.S. 1215, 114 S.Ct. 1339, 127 L.Ed.2d 687 (1994). Furthermore, a trial judge has a right to participate in voir dire examination. Tenn. R.Crim. P. 24(a). Tennessee Rule of Criminal Procedure 24(a) provides: "The court may put to the respective jurors appropriate questions regarding their qualifications to serve as jurors in the case...." The trial court found that its juror questionnaire covered the topics sufficiently. Appellant has failed to show that the inquiries made by the trial court were improper or inadequate and has failed to show any abuse of discretion by the trial court. Thus, this issue is without merit.

## V. Information on Past Performance of Prospective Jurors

Appellant contends that the trial court erred in denying his motion requiring the State to produce any information it had with regard to the past performance of prospective jurors. Appellant argued that he did not have the funds to hire an investigator to discover this information. The trial court denied the motion and ruled that such information could be found in the juror questionnaire and developed through voir dire. Appellant contends on appeal that the trial court's ruling violated his right to a jury trial found in Article I, Section 9 of the Tennessee Constitution and violated his due process rights found in the federal and state constitutions. Moreover, appellant contends that the court's questionnaire did not adequately address this issue and that voir dire is an insufficient tool because of the possibility of false statement or faulty memory as to past service.

Appellant fails to cite to the portion of the appellate record containing the questionnaire he challenges with respect to this issue. Further, it does not appear that the questionnaire submitted to the jurors by the trial court was made a part of the appellate record. "Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." Tenn. R. Ct.Crim.App. 10(b). Appellant's brief and the appellate record are devoid of any evidence that appellant was prejudiced by the trial court's failure to require the State to provide appellant with information regarding the past performance of prospective jurors. This issue is without merit.

## VI. Constitutionality of Tennessee Code Annotated Section 22–1–102

Appellant challenges two subsections of Tennessee Code Annotated section 22–1–102, which deem certain persons incompetent to act as jurors. Specifically, appellant contends that the statute is unconstitutional to the extent it excludes persons who have been convicted of certain infamous offenses, persons of unsound mind, and habitual drunkards. Tenn.Code Ann. § 22–1–102(a)(1), (4).

In making his argument, appellant notes that jury service is a right secured to all citizens under the federal and state constitutions. *Georgia v. McCollum*, 505 U.S. 42, 48–50, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992); *Wolf v. Sundquist*, 955 S.W.2d 626, 633 (Tenn.Ct.App.1997). He argues that Tennessee Code Annotated section 22–1–102 is overly broad in excluding all felons

from jury service when some felons have rehabilitated themselves to the extent they could serve impartially on a jury. He further contends that the statute is overly broad in excluding "habitual drunkards" from serving on juries as some functional alcoholics are capable of serving in an impartial and attentive manner so long as they are not under the influence of alcohol at the time of trial. Finally, appellant contends that the statute is vague as it relates to persons of "unsound mind." Appellant argues that there is no accepted definition of unsound mind in the psychiatric or psychological community. Appellant contends that because the term can mean anything the court wants it to mean, it is void for vagueness.

As the State noted in its brief, the United States Supreme Court has held that states are "free to prescribe qualifications for [their] jurors and to provide reasonable exemptions so long as it may be fairly said that the jury lists or panels are representative of the community." *Taylor v. Louisiana*, 419 U.S. 522, 538, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975). There is no evidence that the operation of this statute violates the fair cross-section requirement of the Sixth Amendment. This issue is without merit.

## VII. Exclusion of Jurors Based on Religion

Appellant filed a pretrial motion to prevent prospective jurors who stated that they could not impose the death penalty due to their religious convictions from being excluded from the jury. Appellant contends that the trial court erred in denying his motion to prevent exclusion of prospective jurors because of their religion. Appellant argues that the exclusion of jurors who claim that they cannot impose the death penalty due to their religious

convictions violates the Tennessee Constitution, which provides that "no political or religious test shall ever be required as a qualification for jurors." The trial court denied appellant's motion, stating that it would use the tests formulated in *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968) and *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985) to determine juror qualification.

Appellant raised this issue in the appeal of his conviction for the Captain D's murders. The Tennessee Supreme Court ultimately held that the exclusion of prospective jurors by a trial court because of their moral or religious based reluctance to impose the death penalty is not error. *Reid*, 91 S.W.3d at 289–90. "In this regard, potential jurors are removed for cause not because of their religious opinion or affiliation but because the jurors are unable to view the proceedings impartially and perform their duties in accordance with the juror's oath." *Id.* at 290. Questioning of a juror with regard to the death penalty does not amount to a religious test. *Id.* (citing *Wolf*, 955 S.W.2d at 631.) Appellant acknowledges that the Tennessee Supreme Court has rejected this argument but makes the argument in order to preserve it for later review. Accordingly, this issue is without merit.

## VIII. Exclusion of Jurors who Were not "Death Qualified"

Pretrial, appellant moved the court to refrain from excluding jurors for cause based on their opposition to the imposition of the death penalty because the exclusion of jurors who are not "death qualified" under *Witherspoon* and *Wainwright* denied him a constitutional right to have an impartial jury composed of a fair cross-section of the community. Appellant acknowledges the Tennessee Supreme Court

has rejected this argument but asserts it in order to preserve later review. Accordingly, this argument is without merit.

## IX. Separate Juries on Issues of Guilt and Sentencing

Appellant moved the trial court to have one jury determine his guilt or innocence and a second jury to determine his sentence, which the trial court denied. On appeal, appellant asserts that separate juries are necessary to ensure his right to a fair trial under the Tennessee and federal constitutions. This argument was rejected by our supreme court in *State v. Dellinger*, 79 S.W.3d 458, 478–79 (Tenn.2002), which appellant acknowledges. Appellant asserts this issue in order to preserve it for later review. This issue is without merit.

## X. Constitutionality of Tennessee Code Annotated Section 39–13–204(h)

Appellant moved the trial court to declare Tennessee Code Annotated section 39–13–204(h) unconstitutional, arguing that prohibiting the trial court from informing the jury as to the effect of a nonunanimous verdict in the sentencing phase violates his state and federal constitutional rights to a fair trial. Appellant acknowledges that this argument was rejected by the Tennessee Supreme Court in *State v. Hall*, 958 S.W.2d 679, 718 (Tenn.1997), but asserts the issue in order to preserve it for later review. Accordingly, this issue is without merit.

## XI. Constitutionality of Death Penalty

Appellant contends that the death penalty statute is unconstitutional because it constitutes cruel and unusual punishment under the Eighth Amendment of the United States Constitution. Appellant concedes that this argument was rejected by

the supreme court in *Hall*, 958 S.W.2d at 718, but asserts this issue in order to preserve it for later review. Accordingly, this issue is without merit.

## XII. Constitutionality of Tennessee Code Annotated Sections 39–13–204 and 39–13–206

Appellant contends that Tennessee's death penalty statutes are unconstitutional. However, he fails to present any constitutional challenges to the death penalty statutes that have not been previously reviewed and rejected.

Appellant relies upon the case of *United States v. Fell*, 217 F.Supp.2d 469 (D.Vt. 2002), in arguing that Tennessee's capital sentencing scheme, particularly Tennessee Code Annotated section 39–13–204(c), is unconstitutional because it allows the death penalty to be imposed based on evidence that is not subject to the guarantees of reliability and trustworthiness required by the due process and confrontation clauses of the federal constitution. This Court rejected that argument in *State v. Gdongalay Berry*, No. M2001–02023–CCA–R3–DD, 2003 WL 1855099, at *7 (Tenn.Crim.App. at Nashville, Apr. 10, 2003) (holding that Tennessee's sentencing scheme, including Tennessee Code Annotated section 39–13–204(c), is constitutional). Appellant argues, however, that the *Berry* court erred in finding Tennessee's sentencing scheme constitutional. Specifically, appellant contends that the court erred by rejecting the analysis of the *Fell* court and adopting the reasoning of *United States v. Matthews*, 246 F.Supp.2d 137 (N.D.N.Y.2002). Appellant maintains that both *Matthews* and *Berry* ignore a central theme in United States Supreme Court jurisprudence: that because death is a unique punishment in terms of its irrevocability, it requires more rigorous and scrupulous procedures than other criminal

matters to ensure maximum reliability. Further, appellant contends that because the Tennessee sentencing scheme does not contain a provision analogous to Federal Rule of Evidence 403, allowing the trial court to exclude evidence if its prejudicial effect outweighs its probative value, the trial court must admit any evidence that is "relevant" or "probative" to the issue of punishment, regardless of whether the evidence is reliable or more prejudicial than probative. Accordingly, appellant contends that the *Berry* court erred in upholding the constitutionality of Tennessee Code Annotated section 39–13–204(c) and urges this court to dispense with the *Berry* opinion, find the statute unconstitutional, and reverse this case.

The death penalty statutes have repeatedly been held constitutional. *See e.g., State v. Keen*, 31 S.W.3d 196, 233 (Tenn. 2000), *cert. denied*, 532 U.S. 907, 121 S.Ct. 1233, 149 L.Ed.2d 142 (2001); *State v. Nesbit*, 978 S.W.2d 872, 902 (Tenn.1998), *cert. denied*, 526 U.S. 1052, 119 S.Ct. 1359, 143 L.Ed.2d 520 (1999); *State v. Vann*, 976 S.W.2d 93, 117 (Tenn.1998), *cert. denied*, 526 U.S. 1071, 119 S.Ct. 1467, 143 L.Ed.2d 551 (1999); *State v. Bland*, 958 S.W.2d 651, 663 (Tenn.1997), *cert. denied*, 523 U.S. 1083, 118 S.Ct. 1536, 140 L.Ed.2d 686 (1998); *Bigbee*, 885 S.W.2d at 813–14; *State v. Smith*, 857 S.W.2d 1, 21–22 (Tenn. 1993), *cert. denied*, 510 U.S. 996, 114 S.Ct. 561, 126 L.Ed.2d 461 (1993); *State v. Bane*, 853 S.W.2d 483, 488 (Tenn.1993); *see also Berry*, 2003 WL 1855099, at \*4–\*5.

## XIII. Failure to Dismiss Indictment Pursuant to Article I, Section 19 of Tennessee Constitution

Appellant contends that the trial court erred in denying his motion to dismiss the indictment based upon its violation of Article I, Section 19 of the Tennessee Constitution. Appellant acknowledges that the supreme court rejected this argument in *Van Tran*, 864 S.W.2d at 481, but asserts the issue on appeal to preserve it for later review. Accordingly, this issue is without merit.

## XIV. [Deleted: Failure to Dismiss Indictment Because Aggravating Factors not Listed in Indictment]

## XV. Failure to Allow Defendant to Address the Jury Last

Appellant contends that the trial court erred in failing to allow him to address the jury last during closing arguments in the penalty phase of the trial. This issue has been rejected by our supreme court. *Smith*, 857 S.W.2d at 24. This issue is without merit.

## XVI. Reliability of DNA Testing

Appellant contends that the trial court erred in denying his motion for a pretrial hearing to determine the reliability of the polymerase chain reaction ("PCR") DNA testing used in this case, pursuant to *McDaniel v. CSX Transportation, Inc.*, 955 S.W.2d 257 (Tenn.1997). In *McDaniel*, the Supreme Court clarified the standards for the admission of scientific evidence under Tennessee Rules of Evidence 702 and 703. Subsequently, the Tennessee Supreme Court held that pursuant to Tennessee Code Annotated section 24–7–117, mitochondrial DNA evidence met the general standards for admission of scientific or technical evidence and could be allowed as a method of proving identification without expert testimony as to its reliability. *State v. Scott*, 33 S.W.3d 746, 756–60 (Tenn.2000). The trial court herein relied on *Scott* and ruled that a pretrial hearing to determine the reliability of the DNA testing was not necessary. Appellant argues that, although *Scott* held that a *McDan-*

*iel* hearing did not have to be conducted as to mitochondrial DNA testing, this case involves PCR DNA testing rather than mitochondrial DNA testing. Appellant further contends that, "[b]ecause the scientific reliability of the specific type of testing used in this case has never been established, the trial court erred in failing to order a *Daniel* [sic] hearing."

The Tennessee Supreme Court has held "the PCR method of DNA analysis an inherently trustworthy and reliable method of identification." *State v. Begley,* 956 S.W.2d 471, 477 (Tenn.1997). In *Begley,* the court held:

> [h]ereafter, the PCR method of DNA analysis shall be admissible into evidence without antecedent expert testimony as to its trustworthiness and reliability, pursuant to Tenn.Code Ann. § 24–7–117(b)(1). As provided by that statute, parties are nevertheless allowed to offer proof that DNA analysis is not trustworthy and reliable. Tenn.Code Ann. § 24–7–117(b)(2). For example, a party can challenge the reliability of a particular test in any given case by a showing of sloppy handling of samples, failure to train the personnel performing the testing, failure to follow protocol, and the like. Such a challenge, however, will go to the weight, not the admissibility, of DNA evidence.

*Id.* at 478 (footnote omitted). Herein, PCR DNA testing was utilized by the TBI and LabCorp expert witnesses. In accordance with *Begley,* we conclude that the PCR DNA evidence was admissible without antecedent expert witness testimony as to its trustworthiness and reliability. Accordingly, this issue is without merit.

## XVII. Admission of Victim Impact Evidence

Appellant contends that the trial court erred in denying his motions to exclude all victim impact evidence and challenges the victim impact jury instruction in *State v. Nesbit,* 978 S.W.2d 872, 892 (Tenn.1998). Specifically, appellant argues victim impact testimony is prejudicial and irrelevant under the capital sentencing structure established by Tennessee Code Annotated section 39–13–204(g)(1) and *Nesbit,* 978 S.W.2d at 892, and should be excluded. Appellant asserts that Tennessee Code Annotated section 39–13–204(g)(1) mandates that a jury "shall" return a verdict of death once a jury decides that aggravating circumstances exist and they outweigh any mitigating circumstances. Appellant asserts that, under *Nesbit,* the jury is not permitted to consider the victim impact evidence until after finding that at least one aggravating circumstance exists and that the aggravating circumstance(s) outweigh any mitigating circumstances beyond a reasonable doubt.

Appellant also argues that the *Nesbit* jury instruction is illogical. The instruction reads as follows:

> You may consider the victim impact evidence in determining the appropriateness of the death penalty only if you first find that the existence of one or more aggravating circumstances has been proven beyond a reasonable doubt by evidence independent from the victim impact evidence, and find that the aggravating circumstance(s) found outweigh the finding of one or more mitigating circumstances beyond a reasonable doubt.

*Nesbit,* 978 S.W.2d at 892.

Appellant contends that the jury charge in effect "moots" the victim impact evidence because Tennessee Code Annotated section 39–13–204(g)(1) requires the jury to return a verdict of death if it finds that an aggravating circumstance or circumstances exist beyond a reasonable doubt

and outweigh any mitigating circumstances beyond a reasonable doubt.

Victim impact evidence has been declared constitutional by the United States Supreme Court and the Tennessee Supreme Court. *Payne v. Tennessee*, 501 U.S. 808, 827, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991); *Nesbit*, 978 S.W.2d at 889. Furthermore, the argument advanced by appellant that victim impact testimony is irrelevant and should be excluded under Tennessee's current capital sentencing system, has also been rejected by the Tennessee Supreme Court. *See Reid*, 91 S.W.3d at 282–83 (holding that any contradiction between the statute and the *Nesbit* instruction inures to the benefit of the defendant; therefore, this argument does not entitle the defendant to relief). This issue is without merit.

### XVIII. [Deleted: Amendment of Indictment]

### XIX. Failure to Consolidate This Case with Davidson County Cases

■ On August 13, 1998, appellant filed a motion to consolidate this case with the two pending cases in Davidson County pursuant to Tennessee Rules of Criminal Procedure 13(a) and 8(b). The trial court found that while consolidation was legally permissible under Tennessee Rules of Criminal Procedure 8 and 13, it was not appropriate under the facts of this case.

Tennessee Rule of Criminal Procedure 8(b) provides for permissive joinder if the "offenses constitute parts of a common scheme or plan or if they are of the same or similar character." The trial court issued a well-reasoned memorandum, finding that joinder was not appropriate under Tennessee Rule of Criminal Procedure 8(b) because it did not have sufficient evidence to support the theory that the offenses involved constituted a common scheme or plan. The court found that it had insufficient facts to establish that the modus operandi in the Davidson County incidents was probative of appellant's identity in the Montgomery County incident. The trial court noted that the perpetrator in the Montgomery County incident removed the victims from the scene and killed them by cutting their throats with a knife, whereas the Davidson County perpetrator shot the majority of the victims at the two crime scenes. Therefore, the court concluded that it could not find that there was a unique method used in committing the crimes as required by *State v. Hoyt*, 928 S.W.2d 935, 943 (Tenn. Crim.App.1995). The trial court also found that although some of the witnesses would testify in the trials of all three offenses, many of the witnesses were necessary for only one of the trials. The trial court then reasoned that "capital trials are very lengthy and very complicated. A jury in this type of case is required to absorb, process, and evaluate a great deal of information. Given the limited factual similarities among the cases, consolidating them would create an unnecessary and, arguably, unmanageable burden on the jury." The court's memorandum on the issue of the factual appropriateness of consolidation spans five pages with citations to case law and the Rules of Criminal Procedure. Thus, appellant mischaracterized the trial court's decision on consolidation by stating that it "gave no specific reason for its decision, simply explaining that the decision of whether to order consolidation is in the court's discretion."

■ Permissive joinder pursuant to Rule 8(b) of the Tennessee Rules of Criminal Procedure is governed by an abuse of discretion standard, and a trial court's decision to consolidate offenses will not be reversed unless the court applied an incor-

rect legal standard or reached a decision which is against logic or reasoning that caused an injustice to the party complaining. *Spicer v. State,* 12 S.W.3d 438, 442–43 (Tenn.2000).

Appellant asserts that he was prejudiced by the court's decision not to consolidate. He asserts that "if the jury had been able to hear the details of the other, similar murders it might well have afforded the expert proof regarding Defendant's well-documented mental illnesses more credence." After a review of the record on this issue, this Court cannot conclude that the trial court abused its discretion in denying appellant's motion to consolidate. This issue is without merit.

## XX. [Deleted: Competency of Appellant to Stand Trial]

## XXI. and XXII. Testimony of Rev. Joe Ingle, Mary Ann Hea, and Ron Lax at Competency Hearing

At the competency hearing, appellant sought to introduce the testimony of Reverend Joe Ingle, Mary Ann Hea, and Ron Lax. He asserts that these three witnesses would have testified as to appellant's incompetency to stand trial. Appellant contends that the information possessed by these witnesses is absolutely critical to a fair determination of his competency to stand trial. Rev. Ingle was not allowed to testify because appellant refused to waive the priest/parishioner privilege. Defense counsel withdrew witnesses Hea and Lax because the court ruled that it would permit "wide open" cross-examination as to each of these witnesses on matters relevant to competency, even though defense counsel requested that the cross-examination of these witnesses be limited because they each worked with appellant's "defense team" in connection with appellant's Davidson County cases. The court deter-

mined that because these witnesses were part of appellant's defense team, appellant would be required to waive the attorney/client privilege. Appellant refused to waive his privileges.

Rev. Joe Ingle, appellant's minister, was prepared to testify that he had visited and counseled hundreds of mentally ill prisoners over the past twenty-five years, and appellant was the most mentally ill prisoner he had ever counseled. Rev. Ingle had spent more time with appellant than all of the expert witnesses combined. Appellant contends that, although Rev. Ingle is not a trained psychiatrist or psychologist, his lay perceptions of appellant mirror those offered by Drs. Auble and Amador, which is "highly significant." In the affidavit offered by Rev. Ingle, he states that appellant is obsessed with the desire to be normal. When he was able to break through appellant's "mask of normalcy" and get him to reveal his true thoughts, he found appellant's thinking bizarre and delusional. Appellant advised Rev. Ingle that he is being "set up" by the government. Appellant further contends that Rev. Ingle's testimony would have provided a disinterested perspective on his mental health that could have rehabilitated the defense experts.

Mary Ann Hea is a social worker employed by the Davidson County Public Defender's Office. Hea would have testified to the substance of her many interviews with appellant. The trial court held that because Hea was employed by the public defender's office, she stood in the same position as an attorney. Thereafter, defense counsel excused Ms. Hea as a witness.

Appellant also sought to call Ron Lax as a witness at the competency hearing. Mr. Lax is a defense investigator involved in appellant's McDonald's murders case in Davidson County. The defense sought to

question Lax based upon two interviews with appellant during June 1999, and counsel requested that the court limit the State's cross-examination of Lax to these two interviews. The trial court denied the request, ruling that on cross-examination the State would be entitled to ask Lax about all of the interviews he had conducted with appellant, and the State would be able to discover all of Lax's reports of these interviews as *Jenks* material. As a result, the defense did not offer Lax as a witness.

Appellant acknowledges that Tennessee follows the "wide-open" approach to cross-examination but argues that cross-examination is limited to questions that are designed to elicit relevant evidence. *See State v. Adkisson*, 899 S.W.2d 626, 645 (Tenn.Crim.App.1994). Appellant asserts that because the defense experts testified that appellant was competent to stand trial until the late spring or early summer 1999, appellant's competency to that point was not at issue, and the State should have been limited to questioning Lax as to his interviews of appellant following the appellant's "deteriorated state" only. Otherwise, the trial court was authorizing the State to "delve into wholly irrelevant matters in its cross-examination." The State counters that it should have been provided the opportunity to cross-examine the witness with regard to his conversations and interactions with the appellant touching on his competency and incompetency.

Tennessee Rule of Evidence 611(b) provides that the scope of cross-examination extends to "any matter relevant to any issue in the case, including credibility." Because appellant's competency was at issue, conversations and interactions Lax had with appellant prior to his determination that appellant was no longer competent would be relevant. The differences in

appellant's actions and statements in his prior interviews and the June 1999 interviews would be relevant, and they would certainly be an area ripe for cross-examination. Mr. Lax certainly made his determination as to appellant's competency based upon his relationship and involvement in appellant's case over the two year period he worked with appellant, rather than solely on the two June 1999 interviews. This court determines that the trial court did not abuse its discretion with regard to this ruling.

As for witnesses Hea and Ingle, appellant asserts that a criminal defendant has a due process right to call witnesses on his own behalf. *Washington v. Texas*, 388 U.S. 14, 23, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1976). Appellant then asserts that the trial court's rulings with respect to these witnesses "impinged upon [his] right to present a defense to an unconstitutional degree" and cites *Knight v. Dugger*, 863 F.2d 705, 725–29 (11th Cir.1988). Appellant further contends that the trial court erred when it invoked mere evidentiary privileges to deny, or at least diminish, his right to call witnesses to support his claim of competency. The issue of the appropriate burden in establishing competency is of manifest importance to the issue of whether the trial court erred in allowing appellant to assert his privileges.

Appellant contends that the trial court's rulings as to Ingle and Hea are incorrect because appellant was presumed to be incompetent at the hearing and, therefore, did not have the ability to assert or waive either the priest/parishioner privilege or the attorney/client privilege. The appellant relies upon the 1911 Tennessee Supreme Court case of *Jordan v. State*, 124 Tenn. 81, 135 S.W. 327, 329 (1911), and the case of *State v. Black*, 815 S.W.2d 166, 174 (Tenn.1991), for the proposition that the State bears the burden of proving a defen-

dant's competence to stand trial once the issue of competency is raised. It is the appellant's position that, once competency is raised, a criminal defendant is presumed incompetent until the State proves otherwise. The State, however, asserts that the burden is on the criminal defendant to establish his incompetency to stand trial by a preponderance of the evidence and relies on *United States v. Shepard,* 538 F.2d 107, 110 (6th Cir.1976), and *State v. Oody,* 823 S.W.2d 554, 559 (Tenn.Crim. App.1991). The trial court asserted in its memorandum opinion on the motion for new trial that the law on the burden of proof is unclear. Appellant asserts that the supreme court cases of *Jordan* and *Black* place the burden of proof on the State by "approving" jury instructions that placed the burden on the State. Appellant submits that because the supreme court is the highest court in the state, the court of criminal appeals' decision in *Oody* "is of no consequence."

This Court determines that, based on *Oody,* the burden of proof at a competency hearing rests on the criminal defendant to establish incompetency to stand trial by a preponderance of the evidence. Appellant's reliance on *Black* and *Jordan* is misplaced. *Jordan* did not hold simply that the burden was on the State to prove competency by a preponderance of the evidence as argued by appellant. Rather, *Jordan* adopted a shifting of the burden when it found that the following jury charge was "in all things correct." *Jordan,* 135 S.W. at 329.

> The law presumes that all persons are of sound mind until the contrary is made to appear. When, therefore, any person charged with a criminal offense punishable by death or imprisonment pleads *insanity, as in this case,* and presents evidence establishing or tending to establish the said plea, which evidence is sufficient to rebut and overturn the presumption of sanity, then it must be made to appear to your satisfaction from all the evidence that the defendant is of sufficient mental capacity to give sane advice to his counsel involving the charge in the indictment.

*Id.* at 328 (emphasis added). This charge does not support appellant's contention that once the issue of competency is raised, the burden is on the State the prove competency. Instead, *Jordan* requires a shifting of the burden whereby the defendant must first present evidence establishing incompetency, rebutting and overturning the presumption of competency. If the presumption of competency is sufficiently rebutted, then the burden shifts to the State.

Further, the mere reference of a trial court's statement in *Black* that the burden of proof was on the State to prove competency does not relegate that statement to the law in Tennessee. The holding in *Black,* relevant to the competency issue, was a determination that the criminal defendant in that case was competent to stand trial under the standards enunciated in the cases of *Duskey, Mackey,* and *Benton,* not who bore the burden at the competency hearing. *Black,* 815 S.W.2d at 173–75. Moreover, three months after the supreme court's decision in *Black,* the Tennessee Supreme Court declined to grant permission to appeal in *Oody* and has not since addressed this issue.

Because appellant is presumed competent at the hearing, appellant had the right to assert his privileges, which prevented the witnesses at issue from testifying. This Court concludes that there was no error in the trial court's rulings on this issue.

## XXIII. Testimony of Dr. Xavier Amador

Appellant contends that the trial court erred in forcing defense expert Dr. Xavier Amador to testify at the competency hearing without giving him sufficient time to: (1) review cassette tapes Dr. Bernet had recorded during his interview with appellant prior to the competency hearing and (2) review Dr. Turner–Graham's report. The proof at the competency hearing was presented out of order due to Dr. Amador's scheduling constraints. The defense presented Dr. Pamela Auble as its first expert. Next, the State presented the testimony of Dr. Bernet, during which cassette tapes of a two hour and fifteen minute interview with appellant were introduced. Dr. Cynthia Turner–Graham testified next. Following her testimony, the court asked defense counsel to call its next witness. Dr. Amador's flight, however, had been cancelled the previous night, and he had not yet arrived. When Dr. Amador arrived, he was given Dr. Turner–Graham's report and the tapes from Dr. Bernet's interview for his review.

Defense counsel asked that Dr. Amador be given additional time to review the tapes and report upon his arrival. The trial court denied the request explaining that Dr. Amador had at least thirty minutes to review the report, and that he could review the tapes during the lunch break. Further, the court explained that defense counsel heard the tapes and could advise him concerning the same.

Dr. Amador never indicated that his testimony was compromised by insufficient time to review the report or the tapes. Appellant argues that, if Dr. Amador had been given additional time to review Dr. Bernet's taped interview, he would have been better equipped to challenge Dr. Bernet's conclusions. This court finds that the record does not support appellant's arguments on this issue. This issue is without merit.

## XXIV. [Deleted: Testimony of Dr. Turner–Graham]

## XXV. Testimony of Elfreida Lane

During Elfeida Lane's redirect testimony, the prosecuting attorney asked her if she had ever been through the drive-thru window at Baskin–Robbins with her daughter and appellant. Ms. Lane replied, "We did not go through Baskin Robbins, sir." Counsel then attempted to ask another question, and Ms. Lane interrupted and said, "that was my daughter that said that not—we did not go through Baskin Robbins. Not to my knowledge." Defense counsel then objected to the hearsay. The State responded that it had not intended to elicit hearsay testimony. The trial court sustained the objection and instructed the jury to disregard that portion of Ms. Lane's testimony and consider it for no purpose. Thereafter, the State asked Ms. Lane if she and a member of her family and appellant had gone through the drive-thru at Baskin–Robbins. After Lane responded that she could not remember doing so, counsel asked if it was possible that, after they dined at Logan's, they went to get ice cream. Ms. Lane stated that she could not remember doing so.

At no point during this exchange did defense counsel request a mistrial. Appellant now asserts that the court should have *sua sponte* granted a mistrial. A mistrial should be declared in a criminal trial only in the event of a "manifest necessity" that requires such action. *State v. Hall,* 976 S.W.2d 121, 147 (Tenn.1998) "The purpose for declaring a mistrial is to correct damage done to the judicial process when some event has occurred which precludes an impartial verdict." *State v. Williams,* 929 S.W.2d 385, 388 (Tenn.Crim.

App.1996). The determination of whether to grant a mistrial rests within the sound discretion of the trial court. *State v. Smith,* 871 S.W.2d 667, 672 (Tenn.1994). The reviewing court should not overturn that decision absent an abuse of discretion. *Reid,* 91 S.W.3d at 279. Moreover, the burden of establishing the necessity for a mistrial lies with the party seeking it. *Williams,* 929 S.W.2d at 388.

Appellant's counsel did not move for a mistrial based upon the hearsay testimony by Ms. Lane. Moreover, the trial court gave a curative instruction, which the jury is presumed to have followed. *Hall,* 976 S.W.2d at 148. This issue is without merit.

## XXVI. Testimony of Loretta Diorio and Stephen Diorio

During a break in the testimony of Stephen Diorio, he went into the hallway and sat with his mother, Loretta Diorio, who had already testified. As they were sitting in the hallway, a news reporter was making a live broadcast concerning the trial. Appellant's counsel immediately alerted the court and moved to strike the testimony of both Stephen and Loretta Diorio. The court questioned Stephen Diorio outside of the presence of the jury about what he had heard. Stephen admitted that he heard part of the news report and that the reporter stated that, after a long pause, "I pointed out the person." He did not hear anything else the reporter said. The court then ruled that there was no Tennessee Rule of Evidence 615 violation. The court went on to state that, although witness Stephen Diorio could have been adversely affected and the Rule compromised, the same had not occurred.

On appeal, the appellant argues that the trial court erred. Tennessee Rule of Evidence 615 provides in pertinent part: "At the request of a party the court shall order witnesses, including rebuttal witnesses, excluded at trial or other adjudicatory hearing ... The court shall order all persons not to disclose by any means to excluded witnesses any live trial testimony or exhibits created in the courtroom by a witness." Tenn. R. Evid. 615. The sequestration rule is designed to prevent witnesses from hearing the testimony of other witnesses and subsequently adjusting their testimony. *State v. Harris,* 839 S.W.2d 54, 68 (Tenn.1992). When a sequestration rule violation is raised on appeal, the court shall consider the seriousness of the violation and the prejudice, if any, suffered by the defendant. *Id.* at 68–69. In the case at bar, any violation was minor, appellant suffered no resulting prejudice. This issue is without merit.

## XXVII. Introduction of Undergarment of Victim Angela Holmes

During the trial, Tobaris Holmes identified the clothing his wife was wearing on the night of her murder. The clothing was found at the crime scene and included Angela Holmes's bra. The State moved for the admission of the articles of clothing into evidence without objection. Appellant now argues that the court should have removed the bra from evidence. Appellant argues that the bra had little or no relevancy and that any relevancy was outweighed by the prejudice it caused.

Appellant failed to object when the bra was admitted into evidence. The failure to make a contemporaneous objection constitutes a waiver of the issue on appeal. Tenn. R.App. P. 36(a); *see also State v. Little,* 854 S.W.2d 643, 651 (Tenn. Crim.App.1992). This issue is without merit.

## XXVIII. Exclusion of TBI Memorandum

During the cross-examination of TBI agent Samera Zavero, appellant attempted to introduce into evidence a TBI memorandum, which stated that a person named James Jones could not be excluded as a possible donor of the DNA found on appellant's right shoe. The trial court excluded the memorandum as irrelevant because there was no evidence that James Jones had anything to do with the case. Appellant argued that the memorandum was relevant because the State mentioned James Jones in opening statement.

During its opening statement, the State told the jury that the case had been a hard case for law enforcement and the proof might show that appellant was not the first suspect in this case. Three men, Jones, Shelly, and Black, all of whom had a crack problem and were partying, taking guns, and selling them for crack, may have been the first suspects. Later in the opening, the State discussed the expected DNA evidence found on appellant's shoes and commented "that's why [the DNA evidence of] Jones and Shelly and Black were given up." The trial court found that the mention of James Jones during opening statement was insufficient to establish the relevance of the document without any other evidence that James Jones had an involvement in the case.

■ Appellant contends that, because the State injected the name of James Jones into the issue of the identity of the perpetrator of the crimes, the memorandum is relevant. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Relevant evidence "may be excluded if its pro-

bative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Tenn. R. Evid. 403. However, "[o]f critical importance here is the nature of opening statements. They are intended merely to inform the trial judge and jury, in a general way, of the nature of the case and to outline, generally, the facts each party intends to prove. Such statements do not amount to stipulations and certainly are not a substitute for the pleadings or for the evidence." *Harris v. Baptist Mem'l Hosp.*, 574 S.W.2d 730, 732 (Tenn.1978).

■ After a review of the evidence, we conclude that the trial court did not err in excluding the TBI memorandum. James Jones was never shown to have any involvement with the case. As such, any reference to him in a TBI memorandum is irrelevant to the determination of the facts at issue. Accordingly, this issue is without merit.

## XXIX. Testimony of Jeffrey Potter

■ Appellant contends that the testimony of Jeffrey Potter should have been excluded because his conversation with appellant was too far removed in time from the Baskin–Robbins incident to provide meaningful insight into appellant's motive. The testimony was about a conversation Mr. Potter had with appellant wherein the appellant told him robbery would be an easy way to make money. The trial court held a jury-out hearing to determine when the comment was made in relation to the Baskin–Robbins murders. Potter could not recall the date of the conversation but testified that the statement was made a few months before the Baskin–Robbins murders. He also testified that the statement was made in late summer 1996. Further, he could recall that the statement was made during appellant's second term of employment with Shoney's and that ap-

pellant made the statement shortly before he was terminated. The court ruled that the statement was not too remote in time and allowed him to testify as to the statement.

Potter testified before the jury that appellant made the statement in January 1997, shortly before he was fired. Defense counsel questioned him on the discrepancy in his testimony, and he replied that he had gone home, thought about it, and tried to get everything right.

This court cannot find that the court erred in allowing Potter to testify as to the statement made by appellant. This issue is without merit.

## XXX. Use of Styrofoam Heads by Dr. Harlan as Demonstrative Evidence

■ Appellant challenges the use of demonstrative evidence by the medical examiner as inappropriate. During Dr. Harlan's testimony, he used styrofoam heads to demonstrate, with a pen, the head wounds suffered by the victims. This court approved the use of this type of demonstrative evidence in *State v. Robert E. Cole*, No. 02C01–9207–CR–00165, 1993 WL 539185, at *3 (Tenn.Crim.App. at Jackson, Dec. 30, 1993). In *Cole*, this Court concluded that the evidence was "highly probative as to the issues to be decided by the jury. Under the circumstances, the trial court did not err in admitting the challenged evidence." *Id.* (citing *State v. King*, 718 S.W.2d 241 (Tenn. 1986); *State v. Sexton*, 724 S.W.2d 371 (Tenn.Crim.App.1986)).

This court cannot find that the use of the styrofoam heads was inappropriate in this case as the appellant urges. The trial court did not err in its ruling that the use of the styrofoam heads would assist Dr. Harlan in demonstrating the location of the wounds. This issue is without merit.

## XXXI. [Deleted: Failure to Allow Introduction of Police Report]

## XXXII. [Deleted: Sufficiency of the evidence]

## XXXIII. Prosecutorial Misconduct in Guilt Phase

■ Appellant contends that the prosecutors committed numerous acts of prosecutorial misconduct during their arguments in the guilt phase.[3] When reviewing allegations of prosecutorial misconduct, "[t]he general test to be applied is whether the improper conduct could have affected the verdict to the prejudice of the defendant." *Harrington v. State*, 215 Tenn. 338, 385 S.W.2d 758, 759 (1965); *see also State v. Richardson*, 995 S.W.2d 119, 127 (Tenn.Crim.App.1998).

---

**3.** Among other things, appellant challenges: (1) the State's reference to the DNA database as "big, huge" as misleading to the jury; (2) the implication by the State that appellant had committed other murders by referring to the murders in "this county" and "our county;" (3) the implication by the State that appellant failed to testify; (4) the State's reference to the donor of blood on the shoes of appellant as belonging to the victims; (5) the State's reference to latex gloves that were found at the crime scene and their connection with appellant; and (6) the State's "bank of justice analogy" in closing argument that in-

dicated it was the jury's civic duty to find appellant guilty. Appellant failed to make objections to these alleged instances of prosecutorial misconduct at trial. Appellant's failure to object constitutes waiver of these issues on appeal. *State v. Thornton*, 10 S.W.3d 229, 234 (Tenn.Crim.App.1999) (citing Tenn. R.App. P. 36(a)); *State v. Green*, 947 S.W.2d 186, 188 (Tenn.Crim.App.1997); *Little*, 854 S.W.2d at 651 (holding that failure to object to prosecutor's alleged misconduct during closing argument waives later complaint). Accordingly, these issues are without merit.

The factors relevant to the court's determination are:

1. The conduct complained of viewed in light of the facts and circumstances of the case;

2. The curative measures undertaken by the court and the prosecution;

3. The intent of the prosecutor in making the improper arguments;

4. The cumulative effect of the improper conduct and any other errors in the record; and

5. The relative strength and weakness of the case.

*Nesbit,* 978 S.W.2d at 894.

**Reference to Danny Tackett's testimony**

During opening statement, the prosecutor commented:

You are going to hear testimony from Danny Tackett and maybe another co-worker ... We think Mr. Tackett is going to tell you that he worked with Mr. Reid at a Shoney's ... and that there was talk when the two of them worked about raising money, not by donating money at the Plasma center or anything like that. There was talk about raising money by conducting robberies.

Defense counsel objected, and the court conducted a sidebar conference. The court reminded defense counsel that Tackett's testimony about the conversation would be admissible at trial, a finding he had previously made. The court then advised the prosecutor to limit his remarks to anticipated evidence that he believed in good faith would be forthcoming, not otherwise. At trial, Tackett testified that when appellant asked him about how he could get money, he suggested committing robbery as a means of making money and mentioned a "fast food place, you know,

middle of night, no witnesses." Tackett agreed that he made the suggestion to appellant.

Appellant argues that the prosecutor's comment during opening statement intimated that appellant, not Tackett, made the robbery statement about committing a robbery; therefore, the prosecutor committed misconduct. The prosecutor's comments regarding Danny Hackett's suspected testimony were not improper. Moreover, the comments could not have affected the verdict to the prejudice of appellant, because the jury heard Tackett testify he brought up the robbery suggestion. This issue is without merit.

**Writing of the word "match" on visual aid**

During closing argument, the prosecutor used a visual aid in connection with his argument as to the fiber evidence in the case upon which the word "match" was written. The defense objected, arguing that the word "match" implied identity, whereas the testimony of the expert witness had been that the fibers found on the victims' clothing were "consistent" with fibers found in appellant's car. The trial court overruled the objection, stating, "The rules provide that the closing argument by the State is limited to the subject matter covered in the State's argument and the argument by the defendant. Also the law provides that counsel may comment on the evidence and reasonable inferences that may be drawn therefrom. Discussion about fibers was included in the State's opening argument. It was also covered by the defendant in his argument. So, the rules provide that subject matter is fair game." The trial court further explained, "The specific use of the word match ... if he uses it, that's his take on the evidence. He can comment on what he thinks the evidence is ... The jury heard the evi-

dence, and its [sic] up to them to sort out whether his use of the word match is appropriate or not."

The closing argument is a valuable privilege for both the State and the defense and counsel is afforded wide latitude in presenting final argument to the jury. *See State v. Cribbs,* 967 S.W.2d 773, 783 (Tenn.1998); *State v. Cone,* 665 S.W.2d 87, 94 (Tenn.1984). However, when a prosecutor's argument "veers beyond the wide latitude afforded, the test for determining if reversal is required is whether the impropriety 'affected the verdict to the prejudice of the defendant.'" *Cribbs,* 967 S.W.2d at 783. Appellant argues that the use of the word "match" characterized the proof as much stronger than it actually was, which thereby misled the jury. The prosecutor did not exceed the latitude given him in writing the word match on the visual aid. Moreover, the word "match" on the visual aid did not affect the verdict to the prejudice of appellant. The jury heard the experts' testimony that the fibers on the victims' clothes were "consistent." The experts were thoroughly cross-examined on this point. Additionally, the jury was instructed that arguments of counsel are not to be considered evidence. The jury is presumed to follow instructions. *State v. Smith,* 893 S.W.2d 908, 914 (Tenn.1994). This issue is without merit.

### Appeal to jury's passion

In closing argument, the prosecutor placed pictures of each victim on a projector and left them there for seven minutes. At some point, the prosecutor threw dollar bills on the projector used to display the images of the victims. Appellant asserts that, by these acts, the prosecutor intended to inflame the passion of the jury, which is prohibited. *See Watkins*

*v. State,* 140 Tenn. 1, 203 S.W. 344, 345–46 (1918). The State argues that the prosecutor was simply demonstrating to the jury that it was money that motivated appellant to rob, kidnap, and murder the victims, whose pictures were being projected, and to eliminate the victims as witnesses. These actions, although dramatic, were not "conduct so improper that it affected the verdict." *Harrington,* 385 S.W.2d at 759. This issue is without merit.

### Biblical reference

In closing argument, the prosecutor stated, "No matter how hard you try murder will out. If necessary the stones themselves will cry out. The shoes themselves will cry out as they did in this case. They will show the blood. Blood will out, and it did in this case. He couldn't get rid of every speck of blood." Appellant contends that this argument was based on a passage from the book of Habbukuk in the Bible. Habbukuk 2: 9–11 reads as follows:

9. Woe to him who gets evil for his house, to set his nest on high, to be safe from the reach of harm!

10. You have devised shame to your house by cutting off any peoples; you have forfeited your life.

11. For the stone will cry out from the wall, and the beam from the woodwork respond.

*Habbukuk* 2:9–11 (Revised Standard Edition). Appellant did not make a contemporaneous objection to the prosecutor's comments. Therefore, this issue is waived. *See Thornton,* 10 S.W.3d at 234 (citing Tenn. R.App. P. 36(a)); *Green,* 947 S.W.2d at 188; *Little,* 854 S.W.2d at 651.

Although appellant did not make a contemporaneous objection to the Biblical reference, he moved for a mistrial after the completion of the State's closing argument and after the jury had left the courtroom.

Appellant argued that based on the totality of the prosecutor's argument, specifically including the Biblical reference, the pictures of the victims on the projector for seven minutes, the latex gloves comments, and the bank of justice analogy, the argument appealed to the passion and sympathy of the jury. A mistrial should be declared in a criminal trial only in the event of a "manifest necessity" that requires such action. *Hall*, 976 S.W.2d at 147. "The purpose for declaring a mistrial is to correct damage done to the judicial process when some event has occurred which precludes an impartial verdict." *Williams*, 929 S.W.2d at 388. The determination of whether to grant a mistrial rests within the sound discretion of the trial court. *Smith*, 871 S.W.2d at 672. The reviewing court should not overturn that decision absent an abuse of discretion. *Reid*, 91 S.W.3d at 279. In this case, the trial judge found there was no manifest necessity requiring a mistrial. We agree.

On appeal, appellant correctly notes that any references to the Bible during closing argument are prohibited. *See Cribbs*, 967 S.W.2d at 783. The supreme court has held a Biblical reference to be harmless error. *See id.* at 783 (holding prosecutor's quotation to the Bible, "Whatever a man sows, so shall be reaped" as harmless). In *Cribbs*, the prosecutor acknowledged in his closing that it made him uncomfortable to mention Biblical references, but he then quoted the reap what you sow passage. *Id.* He then explained to the jury that he did not want anyone to be offended by the Biblical reference, but it was a very important part of our law. *Id.* Notwithstanding, the court held that the prosecutor's comments were harmless because they did not affect the verdict of the jury.

 In the order denying appellant's motion for new trial, the trial court found that the reference was of a religious nature and constituted error, but found that it was harmless. The court noted that the "passage is one of relative obscurity. Therefore, the court finds it unlikely that the jurors were actually aware of the remainder of the passage and/or its meaning. This is particularly true given the context of the reference." Based on our review of the record, we find that the prosecutor's Biblical reference did not affect the verdict to the prejudice of appellant and that the trial court did not abuse its discretion. Therefore, this issue is without merit.

## XXXIV. Life Photographs of Victims

 Appellant challenges the introduction of photographs of the victims before they were murdered during the victim impact testimony. Appellant asserts that the photographs served only to inflame the jurors and appeal to their emotions. The State counters that the photographs were probative of the issue of the impact of the death on the victims' family members and to show those unique characteristics which provide a brief glimpse into the life of the victims. The supreme court has held:

> [g]enerally, victim impact evidence should be limited to information to show those unique characteristics which provide a brief glimpse into the life of the individual who has been killed, the contemporaneous and prospective circumstances surrounding the individual's death, and how those circumstances financially, emotionally, psychologically or physically impacted upon members of the victim's immediate family.

*Nesbit*, 978 S.W.2d at 887. In this case, the photographs were introduced to provide a brief glimpse into the lives of the victims, as allowed by *Nesbit*. Accordingly, the court did not err in allowing the introduction of these photographs.

## XXXV. [Deleted: Photographs of Victims at Crime Scene]

## XXXVI. Victim Impact Testimony of Tobaris Holmes

Appellant next contends that the trial court should have excluded the victim impact testimony of Tobaris Holmes during the penalty phase, wherein Mr. Holmes testified that his daughter Ryane "kisses Angela's picture and not Angela." This testimony was given in response to the prosecutor's question, "Mr. Holmes, how has Angela's murder affected your family?" Appellant did not object to Mr. Holmes's testimony; therefore, this issue is waived. *See Thornton,* 10 S.W.3d at 234 (citing Tenn. R.App. P. 36(a)); *Green,* 947 S.W.2d at 188; *Little,* 854 S.W.2d at 651. Further, we find that this statement was proper victim impact testimony under *Nesbit,* 978 S.W.2d at 879. Accordingly, this issue is without merit.

## XXXVII. Testimony of Patricia Allen

Patricia Allen testified at the penalty phase as a speech language pathologist. She testified that she evaluates people with brain injuries to determine if they have been affected by the brain injury. She explained that "language is a code that reflects how someone is thinking." She then testified that, in evaluating a patient, she would look at their "reading and writing and the words they put together in sentences, we would also look at their thinking skills; things such as their ability to attend, to remember, to solve problems and to reason. Things like that." She further explained that a speech language pathologist was more involved in treatment and helping people with brain injuries to function, while a neuropsychologist would be more involved in the evaluation of how the brain is working and the behavior of the individual.

Later in defense counsel's direct examination of Ms. Allen, counsel asked how appellant's brain injury would have impacted his ability to conform to the rules established in the home. The State objected, arguing that such was outside her area of expertise. The court overruled the objection, and the witness responded. Next, after Ms. Allen confirmed that people with brain injuries have difficulty with rules, defense counsel asked: "How so?" Again, the State objected to the questioning as being outside Ms. Allen's area of expertise. This time the court sustained the objection.

It is the longstanding principle that the "propriety, scope, manner and control of examination of witnesses is within the trial court's discretion." *Harris,* 839 S.W.2d at 72. Ms. Allen testified that she, as a speech language pathologist, was more involved in treatment and helping people with brain injuries to function, while a neuropsychologist was more involved in the evaluation of how the brain is working and the behavior of the individual. Accordingly, the trial court did not err in precluding Ms. Allen from testifying as to how a person with a brain injury would have difficulty with rules. Moreover, as the trial court found, any such error in precluding the testimony was harmless. Appellant did not make an offer of proof. Therefore, he failed to demonstrate how he was prejudiced by the trial court's ruling. *See State v. Galmore,* 994 S.W.2d 120, 125 (Tenn.1999) (although an offer of proof is unnecessary to preserve this issue, it may be the only way to demonstrate prejudice). Furthermore, Ms. Allen and the other defense experts testified at length as to appellant's physical and mental abnormalities and the effects of the same. Therefore, any error in sustaining the State's objection was harmless. This issue is without merit.

## XXXVIII, XXXIX and XL. Jury Charge of Mitigating Factors

██ Appellant contends that the trial court erred in charging the jury as to mitigating factors in three respects. First, he contends that the trial court erred in refusing to charge the jury on the statutory mitigator set forth in Tennessee Code Annotated section 39–13–204(j)(6), which provides that "the defendant acted under extreme duress or under the substantial domination of another person." Appellant contends that his delusions caused him to believe he was acting under the control of government agents and, as a result, the "substantial domination" mitigator should have been charged. There is no authoritative support for appellant's contention. Moreover, appellant's mental illnesses were addressed in the statutory and non-statutory mitigators charged to the jury.

Next, appellant contends that the trial court erred by failing to charge the non-statutory mitigators in the same affirmative manner as the statutory mitigators. Basically, appellant attacks the non-statutory mitigators because they were not in the same "sentence structure" as the statutory mitigators. The charge the trial court gave complies with the non-statutory instructions approved by the Supreme Court in *Odom*, 928 S.W.2d at 31–32, and *State v. Hodges*, 944 S.W.2d 346, 352 (Tenn.1997). This issue is without merit.

Finally, appellant contends that the trial court should have charged the "catch-all" mitigator set forth in Tennessee Code Annotated section 39–13–204(j)(9). Appellant did not, however, raise this issue at trial or in his motion for new trial. Failure to make a contemporaneous objection constitutes a waiver of the issue. *See Thornton*, 10 S.W.3d at 234 (citing Tenn. R.App. P. 36(a)); *Green*, 947 S.W.2d at 188; *Little*, 854 S.W.2d at 651. Moreover, failure to raise issues concerning jury instructions in a motion for new trial constitutes a waiver of such issues for purposes of appeal. Tenn. R.App. P. (3)(e); Tenn. R.App. P. 36(a).

██ Notwithstanding appellant's failure to object or raise the issue in a motion for new trial, he contends that the trial court's failure to charge the catch-all mitigator constitutes plain error and should be reviewed by this court. *See* Tenn. R.Crim. P. 52(b); *State v. Ogle*, 666 S.W.2d 58 (Tenn.1984). Plain error exists where the error affects a substantial right of the defendant and strikes at the very fairness or integrity of the trial. Tenn. R.Crim. P. 52(b); *State v. Wooden*, 658 S.W.2d 553, 559 (Tenn.Crim.App.1983). The failure to charge the catch-all statutory mitigator does not strike at the very fairness or integrity of the trial and, therefore, does not constitute plain error. This issue is without merit.

## XLI. Trial Court Comments on State's Proof During Penalty Phase

At the conclusion of the court's explanation to the jury of the sentencing process, the court stated:

> But I say this only because I want you to develop your mind now with a view to looking to the State to offer evidence regarding the aggravating circumstances they contend apply, remembering that you must be convinced beyond a reasonable doubt and also applying the guidelines as I give you in my instructions that tell you how to go about considering those aggravating circumstances and whether or not they outweigh beyond a reasonable doubt the mitigation evidence, if you find such exists, that has been raised during the course of the trial.

Appellant argues that this statement by the court encouraged, at least implicitly,

**350**

the jury to concentrate on the State's proof as opposed to that raised by appellant. Appellant has failed to allege how this statement prejudiced him. This issue is without merit.

### XLII. [Deleted: Prosecutorial Misconduct During Penalty Phase]

### XLIII. [Deleted: Heinous, Atrocious and Cruel Aggravating Factor]

### XLIV. [Deleted: Sufficiency of Evidence to Support Jury's Finding that Aggravating Circumstances Outweighed Mitigating Factors Beyond a Reasonable Doubt]

### XLV. [Deleted: Proportionality Review]

### CONCLUSION

In accordance with Tenn.Code Ann. § 39–13–206(c), we have considered the entire record and conclude that the sentence of death has not been imposed arbitrarily, that the evidence supports the jury's finding of the statutory circumstances, that the evidence supports the jury's finding that the aggravating circumstances outweigh the mitigating circumstances beyond a reasonable doubt, and that the sentence is not disproportionate. We have also reviewed all issues raised by appellant and conclude there is no reversible error. As a result, the judgments of the trial court and the sentence of death imposed by the jury are affirmed.